Helen E. JONES as next friend and guardian for all livestock animals now and hereafter awaiting slaughter in the United States, et al., Plaintiffs,

v.

Earl S. BUTZ, as Secretary of Agriculture of the United States of America, et al., Defendants.

No. 73 Civ. 1.

United States District Court, S. D. New York.

April 19, 1974.

Henry Mark Holzer, New York City, P. C., of counsel, for plaintiffs c/o Society for Animal Rights, Inc.; Erika Holzer, New York City, on the brief.

Paul J. Curran, U. S. Atty. for the Southern District of New York, New York City, for defendants; Steven J. Glassman, Asst. U. S. Atty., of counsel.

Leo Pfeffer, New York City, for intervenors/amici Joint Advisory Committee of the Synagogue Council of America, and others.

Nathan Lewin, Washington, D. C., for intervenors/amici National Jewish Commission on Law and Public Affairs, and others; Sidney Kwestel, New York City, of counsel.

Before FRIENDLY, Circuit Judge, and PALMIERI and BONSAL, District Judges.

PALMIERI, District Judge.

This action involves a challenge, under the Free Exercise and Establishment Clauses of the First Amendment,[1] to the Humane Slaughter Act (the Act), 7 U.S.C. § 1901 et seq. (1970),[2] and in particular to the provisions relating to ritual slaughter as defined in the Act and

[1]. "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." U.S.Const. amend. I.

[2]. Act of August 27, 1958, Pub.L.No. 85–765, 72 Stat. 862 (1959).

which plaintiffs suggest involve the Government in the dietary preferences of a particular religious group.

The plaintiffs consist of a group of six individuals and three organizations hereinafter described. They seek injunctive relieve as well as a declaration that the questioned statutory provisions are violative of the Constitution. Plaintiffs' application for the convening of a three-judge court, 28 U.S.C. §§ 2282, 2284, was granted by Judge Bonsal on October 25, 1973. The three-judge court was convened and a hearing held on February 11, 1974.

Jurisdiction is alleged under 5 U.S.C. §§ 702 and 703 and 28 U.S.C. §§ 1331, 1343, 1361, 2201, and 2202. The complaint alleges that the amount in controversy exceeds $10,000.

The parties have made cross-motions for summary judgment. Rules 12(c) and 56, Fed.R.Civ.P. Additionally, the defendants have moved for an order dismissing the complaint for lack of jurisdiction over the subject matter and for failure to state a claim upon which relief can be granted. Rules 12(b)(1) and 12(b)(6), Fed.R.Civ.P.

*The Statutory Provisions Involved*

Section 1 of the Act (7 U.S.C. § 1901) declares it to be the policy of the United States "that the slaughtering of livestock and the handling of livestock in connection with slaughter shall be carried out only by humane methods." And section 3 provides:

"The public policy declared in this chapter shall be taken into consideration by all agencies of the Federal Government in connection with all procurement and price support programs and operations and after June 30, 1960, no agency or instrumentality of the United States shall contract for or procure any livestock products produced or processed by any slaughterer or processor which in any of its plants or in any plants of any slaughterer or

processor with which it is affiliated slaughters or handles in connection with slaughter livestock by any methods other than methods designated and approved by the Secretary of Agriculture. . . ." 7 U.S.C. § 1903.

The plaintiffs' challenge to the Act is directed to sections 2(b), 5, and 6 (7 U.S.C. §§ 1902(b), 1905, and 1906). Section 2 provides:

"§ 1902. Humane methods

No method of slaughtering or handling in connection with slaughtering shall be deemed to comply with the public policy of the United States unless it is humane. Either of the following two methods of slaughtering and handling are hereby found to be humane:

(a) in the case of cattle, calves, horses, mules, sheep, swine, and other livestock, all animals are rendered insensible to pain by a single blow or gunshot or an electrical, chemical or other means that is rapid and effective, before being shackled, hoisted, thrown, cast, or cut; or

(b) by slaughtering in accordance with the ritual requirements of the Jewish faith or any other religious faith that prescribes a method of slaughter whereby the animal suffers loss of consciousness by anemia of the brain caused by the simultaneous and instantaneous severance of the carotid arteries with a sharp instrument."

Section 4(c) provides:

"Handling in connection with such slaughtering which necessarily accompanies the method of slaughter described in subsection (b) of this section shall be deemed to comply with the public policy specified by this section." [3]

Section 5 of the Act provides for the establishment of an advisory committee to assist in implementing the Act's provisions, with one of the members of the advisory committee being a "person fa-

---

3. Although this sentence appears in § 1904(c) it is manifest that it was placed there by mistake since it makes reference to the method set out in § 1902(b).

miliar with the requirements of religious faiths with respect to slaughter." 7 U.S.C. § 1905. Section 6 provides:

"Nothing in this chapter shall be construed to prohibit, abridge, or in any way hinder the religious freedom of any person or group. Notwithstanding any other provision of this chapter, in order to protect freedom of religion, ritual slaughter and the handling or other preparation of livestock for ritual slaughter are exempted from the terms of this chapter. For the purposes of this section the term 'ritual slaughter' means slaughter in accordance with 1902(b) of this title." 7 U.S.C. § 1906.

### The Parties

The plaintiffs are six individuals and three organizations having in common a professed commitment to "the principle of the humane treatment of animals" and to "the principle of the separation of church and state." The complaint alleges that each of the individual plaintiffs is a taxpayer, that two of the individual plaintiffs abstain from eating any meat or meat products because of the alleged inhumane treatment of animals prior to slaughter, and that the other individual plaintiffs are consumers of meat who have at times unwittingly eaten meat that allegedly was slaughtered according to the "religious exception" contained in sections 2(b) and 6 of the Act. Two of the organization plaintiffs are unincorporated associations whose members reside in the Southern District of New York; and one is a not-for-profit corporation organized under the laws of New York with its principal offices in New York City.

Defendants are the Secretary of Agriculture, the Acting Administrator of Consumer and Market Services of the Department of Agriculture, and "John Doe," who has since been identified as Rabbi Joseph Soloveitchik, the member of the advisory committee authorized under section 5 who is familiar with the requirements of religious faiths with respect to slaughter.

Intervention has been permitted pursuant to Rule 24, Fed.R.Civ.P., to seven individuals and five organizations speaking for a large number of the estimated 6 million Jews in the United States and representative of the "entire spectrum of Jewish organizational life." The intervenors contend that if the Act is held unconstitutional, they and their members will be deprived of their right to eat ritually slaughtered meat.

The intervenors have an undoubted interest in the legislation under consideration here inasmuch as it affects the production of kosher[4] meat, which is slaughtered according to the ritual method described in section 2(b). This interest is different and distinct from the interest of the federal officials who have been named as defendants in this action and whose responsibility it is to administer the provisions of the Act. In addition, we are persuaded that intervention here will not delay the disposition of the action and will not cause any perceptible prejudice to any existing party. Moreover, the intervenors appeared before Congressional committees at the time the Act was under consideration by Congress and were therefore in a unique position to inform the Court regarding factual matters raised by this action. See Bass v. Richardson, 338 F. Supp. 478, 492 (S.D.N.Y.1971).

### Standing to Sue

The question of standing, vigorously contested in the briefs and upon the argument, presents no serious obstacle to a

---

4. Although the plaintiffs have apparently avoided use of the term "Kosher" and have used the expression "ritually prepared meat" in describing their alleged grievances, the defendants and the intervenors have occasionally used the term "Kosher." It has not been made clear that the two are not interchangeable. Kosher is the Jewish term for any food or vessels for food made ritually fit for use. Ritually slaughtered meat is not necessarily Kosher meat. Not all animals slaughtered in accordance with the ritual requirements of the Jewish faith are Kosher. See 13 Encyclopedia Britannica, Verbo "Kosher," at 493 (1959 ed.).

consideration of the merits. Defendants argue that plaintiffs cannot show that they have suffered any injury in fact by reason of the so-called religious exception of the Act and that therefore they lack standing to maintain this action. Plaintiffs, on the other hand, contend that they, or that at least one of them, have sustained the requisite injury either as taxpayers, in that the Act governs procurement of meat and meat products by the federal government; as consumers of meat who, as a practical matter, are unable to distinguish between meat produced according to subsection (a) and that produced according to subsection (b) of section 2 of the Act, and who therefore are "forced to eat ritually prepared meat"; or as citizens whose moral, religious, and aesthetic beliefs are offended because they are unable to refrain from eating ritually prepared meat. Plaintiffs contend that these alleged injuries are sufficient to confer standing to challenge the constitutionality of the Act.

■ The Supreme Court has recently made it clear that the plaintiffs' asserted injury may reflect " 'aesthetic, conservational, and recreational' as well as economic values." Sierra Club v. Morton, 405 U.S. 727, 738, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972). The fact that the interests claimed to have been injured are shared by many rather than few does not make them less deserving of legal protection through the judicial process. To have standing it is only necessary that the plaintiffs be among the class of persons injured.[5] Thus, in United States v. S. C. R. A. P., 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), the Court held that an unincorporated association of law students in the Washington, D.C. metropolitan area had standing to challenge Interstate Commerce Commission orders pertaining

to railroad tariff increases on the grounds that the agency action might be shown to have a detrimental impact on the environment and natural resources in the Washington metropolitan area, which the plaintiffs claimed to use for camping, hiking, fishing, and sightseeing. Justice Stewart writing for the Court quoted Professor Davis (Standing: Taxpayers and Others, 35 U.Chi.L. Rev. 601, 613 (1968)):

"The basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation." 412 U.S. at 689 n. 14, 93 S.Ct. at 2417.

■ That the plaintiffs' commitment to the principles of humane treatment of animals and to the separation of church and state is deeply held and sincere is not doubted. The intervenors profess to be no less committed to the same principles, and indeed their religious beliefs have a long historical association with the humane treatment of animals. The sole question here is whether the plaintiffs have suffered the requisite injury or have a personal stake in the outcome of this controversy so that the Court can be assured that the issues will be framed with the necessary specificity, that the issues will be contested with the necessary adverseness, and that the litigation will be pursued with the necessary vigor as to make it capable of judicial resolution. See Flast v. Cohen, 392 U.S. 83, 106, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

■ This is not a generalized dispute in which plaintiffs seek to air "generalized grievances about the conduct of government," id.; plaintiffs have raised a specific attack on a particularized legislative enactment, alleging that it is in

---

5. The injury need not be large; it may be a fraction of a vote as in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), a five dollar fine and costs, as in McGowan v. Maryland, 366 U.S. 420, 81 S. Ct. 1101, 6 L.Ed.2d 393 (1961), or a $1.50

poll tax as in Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). Cf. O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

violation of specific constitutional provisions in the First Amendment. The Act in question establishes as the policy of the United States that animals are to be treated humanely prior to and during the slaughtering process, and in addition provides that the Act's provisions with respect to what methods of slaughter are humane shall govern the procurement of all meat and meat products by the federal government through the expenditure of federal moneys. In addition to the moneys spent by the federal government for procurement,[6] there are some moneys spent to pay the travel and subsistence expenses of the members of the advisory committee authorized under section 5 of the Act and to administer the other provisions of the Act. Plaintiffs' allegations of injury in their role as federal taxpayers are therefore sufficient to meet the criteria of Flast v. Cohen, *supra.*

But apart from their status as taxpayers, plaintiffs' allegations of injury as consumers and citizens are sufficient to confer standing here. Plaintiffs allege that the Act contains a religious exception making it impossible as a practical matter to be certain of purchasing meat from animals slaughtered by a process that they consider humane and consistent with the policy of the United States as declared in section 1 of the Act. Plaintiffs contend that this uncertainty causes injury to their moral principles and aesthetic sensibilities. These allegations are substantially comparable to the allegations of environmental injury in United States v. S. C. R. A. P., *supra*, where the Court sustained the standing of plaintiffs. Although the Act in its operative provisions regulates directly only government procurement, we are willing to accept, *cf.* United States v. S. C. R. A. P., *supra*, 412 U.S. at 688–690,

93 S.Ct. 2405, that governmental refusal to purchase the meat of animals slaughtered by the ritual method would so influence production in the great packing houses as to save plaintiffs from the uncertainty of which they complain; indeed, the general structure of the Act rather suggests that Congress believed government procurement policy could have that kind of impact on methods of slaughter and handling in general.

## The Meaning of the Statutory Provisions

Two aspects of the legislative history deserve special mention; first, that in passing these provisions Congress was fully informed with respect to the method of slaughter according to the Jewish ritual method, as well as the handling of livestock prior to such slaughter; and secondly, that the legislative history indicates that opinion among Jewish organizations regarding the inclusion of sections 2(b), 4(c) and 6 of the Act was divided.[7]

The declaration of humaneness becomes a focal point of inquiry in the case. The plaintiffs do not challenge the right of any slaughterer or religious group to slaughter livestock by means of a throat cut administered skillfully with a sharp knife—the Jewish ritual slaughtering method known as *shehitah.* Nor do the plaintiffs challenge the Congressional finding that the throat cut method is a humane method of slaughter. The crux of their complaint rests upon the proposition that in failing to require that the animal be rendered insensible to pain before the handling process, and thus before it is shackled and hoisted, the provisions permitting ritual slaughter are offensive to and inconsistent with the humane purposes of the Act

---

6. The United States Department of Agriculture, for example, procures meat under the National School Lunch Act, 42 U.S.C. § 1751 et seq., the Child Nutrition Act of 1966, 42 U.S.C. §§ 1771–1786, and under 7 U.S.C. § 612c as implemented by 15 U.S.C. § 713c.

7. Certain members of the orthodox Jewish community were alarmed with respect to the implications of the proposed legislation both with regard to the possible restriction of pre-slaughter handling and to the possibility of anti-Semitic propaganda which had accompanied similar legislation in other countries.

and have a special religious purpose in contravention of the First Amendment. In effect, therefore, the plaintiffs contend that the provisions of the Act (sections 2(b) and 6) constitute an exemption from the application of subdivision (a), an act of cruelty to the animal so slaughtered, and a violation of the Religion Clauses of the First Amendment.

Congress characterizes as humane, in section 2 of the Act, either of two methods of "slaughtering and handling." The two methods are set forth in disjunctive paragraphs. The first, subdivision (a), relates to the method by which the animal is "rendered insensible to pain" by some form of stunning—mechanical, electrical or chemical—before being shackled and hoisted. The second, subdivision (b), provides for an alternative method—slaughter "in accordance with the ritual requirements of the Jewish faith or any other religious faith" without making any express reference to the shackling or hoisting or any preslaughter handling procedure. It was conceded, however, upon the argument by counsel for the intervenors, that in practice, because of Department of Agriculture regulations, the Jewish slaughter method often involves the animal's being shackled and hoisted before the animal suffers loss of consciousness.[8] It is precisely this to which the plaintiffs object. They contend that such prior hoisting and shackling is inhumane. The plaintiffs' argument can be paraphrased in substantially the following manner: section 2(a) specifically provides that the animal must be rendered insensible before being shackled and hoisted. The general declaration of policy by Congress contained in section 1 is that only humane methods of slaughter should be carried out. Yet section 2(b) appears to be opposed to the declaration of policy and to be inconsistent with 2(a) because the animal suffers no loss of consciousness during the preliminary shackling and hoisting procedure under the ritual method. Yet this method as well as the method described in 2(a) are both "found to be humane" by the express provisions of the introductory paragraph of section 2; and perhaps by the misplaced provision in section 4(c) as well. Plaintiffs assert that such legislative inconsistency can be explained only as so clear a piece of deference to the tenets of one religious group as to violate the First Amendment.

The intervenors have made a persuasive showing that Congress was fully and competently advised with respect to Jewish ritual practices. It developed at the argument that the shackling and hoisting were not part of the Jewish ritual; but that under Jewish ritual practice it was essential that the animal be conscious at the time of the administration of the throat cut. This appears to be the reason why ritually slaughtered animals are sometimes shackled and hoisted before being killed—a practice prohibited in the Act with respect to other animals. Accepting, *arguendo*, that this constitutes an inconsistency in the statute, the question remains as to whether that inconsistency in any way violates the plaintiffs' rights under the Establishment Clause or the Free Exercise Clause of the First Amendment. Since Congress has determined that the Jewish ritual method is humane under the Act, the plaintiffs' arguments reduce themselves to whether they are really alleging an injury to themselves or an injury to the livestock to be slaughtered

---

**8.** Upon the argument counsel for the intervenors made the following uncontradicted statement:

"In Israel, and indeed, in the old traditional Jewish method, the animal would be laying down on its side, and the throat would be cut on the floor.

"That is not permitted under Department of Agriculture regulations for sanitary reasons. You can't put an animal down in a Department of Agriculture inspected plant on the ground.

"The consequence is that the way the animal is positioned for slaughter in many slaughter houses that use the Jewish ritual method is that it is what is called *shackled and hoisted. It is picked up by its legs, and it is turned upside down so that the throat cut can be administered.*"

in the future, not by way of the throat cut which they concede is humane but because of the pre-slaughter handling which they suggest is not. In this connection section 4(c), the misplaced provision of the statute, expressly referred to section 2(b), setting forth the ritual method of slaughter, and stated that handling necessarily connected with such method "shall be deemed to comply with the public policy specified" by the statute. The draftsmen apparently attempted, perhaps inartistically, to avoid the appearance of inconsistency. But if there is inconsistency in the statute the plaintiffs have not persuaded us that they have suffered a deprivation of rights under the First Amendment.

We note at the outset of the analysis that we do not read subdivision (b) to be an exception to subdivision (a) of section 2. Phrased as it is in the disjunctive, the statute makes neither (a) nor (b) an exception to the other. The described methods are alternative methods; neither is dependent upon the other for the ascertainment of its meaning, and each one is supported by legislative history as a justifiable legislative determination that the stated method of slaughter is indeed humane.

*The Establishment Clause*

Despite this, plaintiffs assert that subsection (b), in permitting slaughterers to slaughter in accordance with the ritual method and, by implication, to handle livestock by whatever means is appropriate prior to such slaughter, had a religious purpose—the protection of a religious belief—and therefore violated the Establishment Clause.

Congress considered ample and persuasive evidence to the effect that the Jewish ritual method of slaughter, and the handling preparatory to such slaughter,[9] was a humane method. It formulated a general policy after evaluating the abundant evidence before it.[10] Congress did not create a religious preference, nor did it create an exception to any general rule. The intervenors have made a persuasive showing that Jewish ritual slaughter, as a fundamental aspect of Jewish religious practice, was historically related to considerations of humaneness in times when such concerns were practically non-existent.

Since we regard the questioned statute as a Congressional declaration of policy, it necessarily follows that the proper forum for the plaintiffs is the Congress and not the courts. Ferguson v. Skrupa, 372 U.S. 726, 729–730, 83 S. Ct. 1028, 10 L.Ed.2d 93 (1963); Flemming v. Nestor, 363 U.S. 603, 617, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). See Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L.J. 1205 (1970). The court cannot be asked to choose among methods of slaughter or pre-slaughter handling of livestock and to decide which is humane and which is not. We do not sit as a "super-legislature to weigh the wisdom of legislation." Day-Brite Lighting, Inc. v. Missouri, 342 U.S. 421, 423, 72

9. *See* Humane Slaughtering of Livestock, Hearings Before the Senate Committee on Agriculture and Forestry on S.1213, S.1497, and H.R.8308, 85th Cong., 2d Sess. (1958). *See also* 104 Cong.Rec. 15368–415 (1958).

10. *See* Humane Slaughtering of Livestock and Poultry, Hearings Before a Subcommittee of the Senate Committee on Agriculture and Forestry on S.1636, 84th Cong., 2d Sess. (1956), which summarizes the testimonials and reports of a number of physiologists and others from the scientific community with respect to the humaneness of the Jewish ritual method of slaughter. Senator Hubert H. Humphrey, chairman of the Subcommittee and one of the principal proponents of the legislation, said on the floor of the Senate during debate that "because the subject matter of kosher slaughter came before the committee, we asked for scientific information relating to the matter. A substantial body of evidence was presented, which is in the files of the Committee on Agriculture and Forestry, and was included by reference in our report . . . Not only is such a procedure accepted as a humane method of slaughter, but it is so established by scientific research." 104 Cong.Rec. 15391 (1958). *See also* Humane Slaughter, Hearings Before the Subcommittee on Livestock and Feed Grains of the House Committee on Agriculture, 85th Cong., 1st Sess. (1957).

S.Ct. 405, 407, 96 L.Ed. 469 (1952), quoted with approval in Ferguson v. Skrupa, *supra*, 372 U.S. at 731, 83 S.Ct. 1028.

■ The Constitutional clause against establishment of religion by law "does not ban federal or state regulation of conduct whose reason or effect merely happens to coincide or harmonize with the tenets of some or all religions." McGowan v. Maryland, 366 U.S. 420, 442, 81 S.Ct. 1101, 1113, 6 L.Ed.2d 393 (1961). Thus the Congressional finding of humaneness in section 2 of the Act was an appropriate legislative function; and its coincidence with a ritual procedure under Jewish religious law does not undercut its validity or propriety.

■ Even assuming, *arguendo*, that Congress permitted the throat-cutting method of slaughter out of deference to the religious beliefs of many orthodox Jews, and chose out of similar deference not to restrain the prior handling of livestock attendant upon such ritual slaughter, Congress did not thereby violate the First Amendment. The accommodations of religious practices by granting exemptions from statutory obligations have been upheld in the Sunday closing cases and in the conscientious objector cases. In Braunfeld v. Brown, 366 U.S. 599, 608, 81.S.Ct. 1144, 1148, 6 L.Ed.2d 563 (1961), Chief Justice Warren, writing for himself and three other justices, made the following statement though rejecting a free exercise claim by Sabbatarians in the absence of statutory exemption:

> "A number of States provide such an exemption, and this may well be the wiser solution to the problem." (Footnote omitted).

A year later the *per curiam* opinion of the Supreme Court in Arlan's Department Store v. Kentucky, 371 U.S. 218, 83 S.Ct. 277, 9 L.Ed.2d 264 (1962), disposed of this issue. In that case an appeal from a judgment of the Kentucky Court of Appeals, 367 S.W.2d 708 (1962), upholding a Sunday closing law that included a blanket exemption for Sabbatarians was dismissed for want of a substantial federal question. The Kentucky court had relied partly on the *Braunfeld* language quoted above and partly on the fact that the Supreme Court had upheld the Massachusetts closing law in Gallagher v. Crown Kosher Super Market, 366 U.S. 617, 81 S. Ct. 1122, 6 L.Ed.2d 536 (1961), without discussing its rather more limited exemptions for Sabbatarians.

Additionally, the Supreme Court has found no conflict between the conscientious objector exemptions of the military draft laws and the Religion Clauses of the First Amendment. Selective Draft Law Cases, 245 U.S. 366, 389–390, 38 S. Ct. 159, 62 L.Ed. 349 (1918). Chief Justice White there stated in effect that the soundness of the proposition that no such conflict existed was such that no more was required than its statement.[11] As Mr. Justice White said in Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970), "[l]egislative exemptions for those with religious convictions against war date from colonial days." *Id.* at 370, 90 S.Ct. at 1812. Although writing in dissent, on another issue in the case, he added that the conscientious objector exemption from the draft may have been granted "because otherwise religious objectors would be forced into conduct that their religions forbid and because in the view of Congress to deny the exemption would violate the Free Exercise Clause or at least raise grave problems in this respect." *Id.* at 369–370, 90 S. Ct. at 1812.

The lesson to be drawn from these Sunday closing and conscientious objector cases is this: that if Congress acted here out of deference to the religious

---

11. "And we pass without anything but statement the proposition that an establishment of a religion or an interference with the free exercise thereof repugnant to the First Amendment resulted from the exemption clauses of the act . . . because we think its unsoundness is too apparent to require us to do more." 245 U.S. at 389–390, 38 S.Ct. at 165.

tenets of many orthodox Jews it did so constitutionally and in substantially the same way as it accommodated the Sabbatarians and conscientious objectors by the exemptions in the applicable statutes.

The plaintiffs have placed much emphasis upon the holding of the Supreme Court in Abington School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), which held Bible reading in the public schools required by state action to be a violation of the Establishment Clause. We do not regard this holding as inconsistent with our views. The requirement in *Abington* that there be a secular legislative purpose [12] is met here by the manifest Congressional intent to establish humane standards for the slaughter of livestock. That one of the provisions of the Act defining humaneness coincided with the method for Jewish ritual slaughter, and even that a wholesale exemption was provided for ritual slaughter and accompanying preparation of livestock to accommodate a religious practice quite apart from the finding of humaneness, neither advanced nor inhibited religion within the intendment of the holding in *Abington*.

In its later decision in Lemon v. Kurtzman, 403 U.S. 602, 612–613, 91 S. Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), the Supreme Court set forth the three tests to be applied in determining whether a law violates the Establishment Clause: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhib-

its religion * * * finally, the statute must not foster 'an excessive government entanglement with religion.'" (Citations omitted.) It is clear that the sections of the Act here under attack do not violate these tests. Read in the context of the entire statute, they have a secular purpose; their principal or primary effect is to provide for humane slaughter; and they do not foster excessive government entanglement with religion.

We do not find it necessary to discuss the holdings of the Supreme Court under the Establishment Clause which are concerned with an excessive entanglement of government with religion [13] because there is no entanglement here. The governmental functions involved have no connection with any religious practices. The only government expenditure attributable to allegations in the complaint is the sum of $210.05 paid to Rabbi Joseph Soloveitchik for travel and subsistence expenses as a member of the advisory committee authorized under section 5. These expenses were paid for the period January 28, 1959 to July 15, 1963. We attribute no significance to this expenditure because it is both *de minimis* and stale.

### The Free Exercise Clause

Insofar as plaintiffs' attack is based on the Free Exercise Clause rather than the Establishment Clause, the answer to it is that they have failed to demonstrate any coercive effect of the statute with respect to their religious practices. The plaintiffs suggest that they are being forced "knowingly or un-

12. The Supreme Court there stated:
"The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion." 374 U.S. at 222, 83 S.Ct. at 1571.

13. The government brief cites the following cases in support of the proposition that in

order to establish a meritorious constitutional claim under the Establishment Clause the plaintiffs must demonstrate an excessive entanglement of Government with religion. Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971); Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); Gillette v. United States, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed. 2d 168 (1971); Walz v. Tax Comm'n, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952).

knowingly" to eat ritually slaughtered meat, while in some cases they have been forced to cease eating meat. Apart from other failings in the claim, they do not allege any impingement upon the practice of any religion of their own. The plaintiffs' assertion of ethical principles against eating meat resulting from ritual slaughter is not sufficient. In the absence of a showing of coercive effect on religious practice, a meritorious claim under the Free Exercise Clause has not been made out. Board of Education v. Allen, 392 U.S. 236, 246–249, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); Abington School Dist. v. Schempp, *supra*, 374 U.S. at 222–223, 83 S.Ct. 1560; Zorach v. Clauson, 343 U.S. 306, 311, 72 S.Ct. 679, 96 L.Ed. 954 (1952). By making it possible for those who wish to eat ritually acceptable meat to slaughter the animal in accordance with the tenets of their faith, Congress neither established the tenets of that faith nor interfered with the exercise of any other.

Defendants' motion for summary judgment is granted, dismissing the complaint with prejudice.

Plaintiffs' motion for summary judgment is denied.

It is so ordered.