COMMACK SELF–SERVICE KOSHER MEATS, INC., d/b/a Commack Kosher, Brian Yarmeisch and Jeffrey Yarmeisch, Plaintiffs,

v.

Rabbi Schulem RUBIN, as Director of the Kosher Law Enforcement Division of the New York State Department of Agriculture and Markets, Defendant,

and

Hon. Sheldon Silver, the Union of Orthodox Jewish Congregations of America, Abe Alper, Jon Greenfield, Jack Lee, Rabbi Moshe Portnoy, Richard Schwartz, Agudath Harabonim of the United States and Canada, Agudath Israel of America, National Council of Young Israel, Rabbinical Alliance of America, Rabbinical Council of America, Torah Umesorah National Society of Hebrew Day Schools, Union of Orthodox Jewish Congregations of America, Defendants–Intervenors.

No. 96 CV 179.

United States District Court, E.D. New York.

July 28, 2000.

Robert Jay Dinerstein, Commack, NY, for plaintiff.

Nathan Lewin, Washington, DC, Mark Belnick, NY, for defendant.

### Opinion and Order

GERSHON, District Judge.

Plaintiffs, Long Island merchants servicing consumers of kosher food products, challenge the constitutionality, under both the United States and New York State Constitutions, of certain of the New York State laws aimed at protecting consumers of food products labeled "kosher" from fraud. The named defendant is the Director of the Kosher Law Enforcement Division of the New York State Depart-

ment of Agriculture and Markets (the "Department").[1] In December 1996, several Orthodox Jewish organizations, a rabbi, a competitor of plaintiffs, and individual consumers of kosher products were permitted to intervene jointly as defendants pursuant to Federal Rule of Civil Procedure 24(b)(2). Discovery has been completed.

Plaintiffs claim that the statutes described below (the "Challenged Laws") violate both the Establishment and Free Exercise Clauses of the First Amendment, and the Equal Protection and Due Process Clauses of the Fourteenth Amendment. Defendant and the intervenors seek summary judgment dismissing the first six counts of the complaint, which challenge the laws on their face. Plaintiffs seek summary judgment on all claims, including count seven, which challenges the laws as applied.

### The Challenged Laws

Section 201–a(1) of the New York Agriculture and Markets Law provides that:

1. A person who, with intent to defraud, sells ... any ... article of food ... and falsely represents the same to be kosher or kosher for Passover, whether such ... article of food ... be raw or prepared for human consumption, or as having been prepared under, and of a product or products sanctioned by, the orthodox Hebrew religious requirements, either by direct statement orally, or in writing, which might reasonably be calculated to deceive or lead a reasonable man to believe that a representation is being made that such food is kosher or prepared in accordance with the orthodox Hebrew religious requirements ... is guilty of a class A misdemeanor, except that ... provided said meat or meat preparation in violation has a retail value in excess of five thousand dollars, [a person] is guilty of a class E felony....

2. All fresh meats, meat by-products, meat food products and poultry offered for sale at retail as kosher shall be marked on the label when packaged or by a sign when not packaged, with the words "soaked and salted" or "not soaked and salted" as the case may be. Such words when marked on the label or by a sign shall be in letters at least as large as the letters of the words on the label or sign designating such meat, meat by-products, meat food products and poultry as kosher.

3. Fresh meat, meat by-products, meat food products and poultry shall be defined as meat or poultry that has not been processed, except for salting and soaking.

4. Every person who sells or exposes for sale, at wholesale or retail, any kosher meat ... or poultry shall retail all records with respect to the origin of such kosher meat ... or poultry....

Section 201–b(1) parallels the provisions of Section 201–a except that it applies specifically to the sale of food products in hotels and restaurants. Section 201–c, entitled "Fraudulent identification of food and food products," provides that no person shall "[w]ilfully mark ... as kosher, or as kosher-style, or as having been prepared in accordance with the Hebrew orthodox religious requirements food or food products not kosher or not so prepared ...."

Section 201–e(2–a) provides that "[i]n the event that non-prepackaged fresh meat or poultry is sold and delivered off-premises as Kosher the meat or poultry and the bill of sale, if any, rendered at the time of delivery shall have affixed to them a label or the printed words 'not soaked and salted' or 'soaked and salted' as the case may be," and Section 201–e(3–c) provides that "[a]ny person or firm owning or operating a slaughterhouse which produces meat or poultry which is offered as kosher in this state shall keep records with respect

---

**1.** Rabbi Rubin has since been replaced by Rabbi Luzer Weiss as Director of the Kosher Law Enforcement Division.

thereto, subject to inspection by the department, regarding the time, place, date, person or organization supervising the slaughter of the animal and the number of animals slaughtered in accordance with orthodox Hebrew religious requirements. . . ."

Section 201–f, which bears the caption "Kosher meat or poultry," provides that:

1. All meat or poultry which is sold . . . and is represented as having been prepared in accordance with orthodox Hebrew religious requirements and which has not been soaked and salted immediately after slaughter on the premises where slaughtered:

(a) shall have affixed to it a tag or plumba stating the date and time of day . . . of slaughter; and

(b) shall be washed in accordance with orthodox Hebrew religious requirements within seventy-two hours after slaughter, and within each subsequent seventy-two hour period, by a duly ordained orthodox rabbi or by a person authorized by him. . . .

2. No person shall sell, offer, or expose for sale any meat or poultry which is represented as having been prepared in accordance with orthodox Hebrew religious requirements, unless such meat or poultry is in compliance with subdivision one of this section.

3. For purposes of this section:

(a) [defining "meat"]

(b) [exempting liver from 1(b) ]

4. All kosher poultry in the form of the whole bird shall be tagged with a plumba identifying it as kosher. Whole birds shall be so tagged at the original slaughterhouse.

5. The commissioner shall promulgate rules and regulations as are necessary to implement the provisions of this section, including but not limited to, the type of kosher identification to be affixed to each of the parts of such meat and poultry.

Section 201–h provides that "[i]t shall be unlawful to label food or food products with the words parve or pareve or in any way to indicate that the food or food product may be used or consumed indiscriminately with meat, poultry or dairy products according to Orthodox–Hebrew requirements when such food or food products are impermissible for such use or consumption."

Finally, Section 26–a establishes a nine-person advisory board appointed by the Commissioner of the Department of Agriculture and Markets to counsel the Commissioner on policy matters, to confer and discuss regulations regarding the preparation of kosher foods, and to propose amendments to the Kosher Laws for adoption by the legislature. The statute provides as follows:

> It shall be the duty of the advisory board hereby established to advise, counsel and confer with the commissioner on matters of policy in connection with the administration and enforcement of laws and rules relating to kosher meats, meat preparations, and food products, to consider all matters submitted to it by the commissioner, and on its own initiative to recommend to the commissioner such changes in the laws or rules relating to the possession, sale and exposure for sale of kosher meats, meat preparations, and food products, as may be deemed advisable to secure the effective administration and enforcement of such laws and rules and, with the consent of the commissioner, to submit for enactment by the legislature such draft or drafts of legislation imposing such further restrictions on the possession, sale and exposure for sale of kosher meats, meat preparations and food products, as may be deemed necessary.

N.Y. Agric. & Mkts. Law § 26–a(4).[2]

The Challenged Laws are contained in a separate section of New York's laws re-

---

**2.** Although plaintiffs sometimes refer to the laws they challenge as N.Y. Agric. & Mkts.

garding adulteration and mislabeling of food products and are additional to N.Y. Agric. & Mkts. § 201, entitled "Misbranding of food," which provides that "food shall be deemed to be misbranded . . . if its labeling is false or misleading in any particular."

Section 201–d provides that violations of the Challenged Laws shall be a class A misdemeanor, except that a person who with intent to defraud sells meat with a retail value of more than five thousand dollars, that is falsely represented to be kosher, is guilty of a class E felony.

## Background

Except as otherwise indicated, the following facts are undisputed.

Plaintiffs Brian and Jeffrey Yarmeisch are butchers in Commack, Long Island. Plaintiffs, along with Evelyn Yarmeisch, run a butcher shop known as Commack Self–Service Kosher Meats, Inc., also known as Commack Kosher, which is itself named as a plaintiff. Plaintiffs describe themselves as "Jewish," but "not observant in accordance with the tenets of Orthodox Judaism." Plaintiffs also state that their butcher shop, Commack Kosher, has "at the times relevant hereto" had "kosher supervision . . . under the auspices of a duly ordained rabbi of the Jewish faith."

Plaintiffs have received citations from the New York State Department of Agriculture and Markets for numerous violations of the Kosher Laws. The most recent offense is alleged to have occurred in February 1993, when Inspector P. Schnell cited plaintiffs for attempting to sell as kosher poultry that did not bear the proper

labeling. Plaintiffs disputed the report and claimed that, at the time of the inspection, the poultry at issue had not been offered to the public for sale. Plaintiffs further asserted that eighteen of the nineteen packages referred to in Inspector Schnell's report had not been removed from the boxes in which they were originally delivered and that each box contained a label indicating that the poultry "was kosher in accordance with the supervisory standards of the Union of Orthodox Congregations." The assessed violation was eventually withdrawn by the Department.

Plaintiffs received similar citations in July 1986, January 1987 and April 1988. In July 1986, plaintiffs were cited for failing to "soak and salt" veal spare ribs. Plaintiffs were sent a notice of violation, stating that the Department had found a package of veal spare ribs which were not "soaked and salted as mandated by Hebrew orthodox religious requirements." Plaintiffs informed the Department that its "store has always soaked and salted all the meats that state that they are soaked and salted." Plaintiffs wrote to the Department that "if this does not meet with the Hebrew orthodox religious requirements, we need to know what the analysis was and what the standards should be." However, they opted not to challenge the violation and paid a fine. The following year, plaintiffs were again cited for possession of an unsalted product—side steaks. Plaintiffs were notified that they were in violation of law for failure to salt the side steaks "as mandated by Hebrew orthodox religious requirements." Plaintiffs sent

Law §§ 201–a et seq., the amended complaint, briefs and oral argument indicate that they are challenging on their face only the laws identified in the text, namely, those laws which, as described infra at pp. 450–51, define kosher as prepared in accordance with orthodox Hebrew religious requirements, require adherence to those requirements, or are integral to the State's enforcement of such requirements. Plaintiffs include within their challenge the statutes referring to meat or

poultry being "soaked and salted," a term which is not defined in the statutes and refers to religious requirements of food preparation. That is, plaintiffs do not challenge those laws which merely require the identification or registration of the person or organization certifying a food product as kosher, see, e.g., N.Y. Agric. & Mkts. Law § 201–g and § 201–e(3), or N.Y. Agric. & Mkts. Law § 201–i, which authorizes certifying persons to file with the department a statement of the person's qualifications.

the Department a letter dated April 29, 1987, stating that they were processing the meat in a manner satisfactory to their supervising rabbi and requesting direction from the State as to the State's interpretation of proper koshering procedures. The Department did not respond to plaintiffs' request but instead issued a complaint against plaintiffs, stating that plaintiffs had failed to kosher their meat "in accordance with orthodox Hebrew religious requirements." The Department found that "Defendant [Commack Kosher] presented to the consumer public that only kosher food, prepared in accordance with orthodox Hebrew religious requirements, was sold on its premises." Plaintiffs deny that they ever made any representation that they sold food koshered "in accordance with orthodox Hebrew requirements," but rather simply represented that their food products were "kosher." Plaintiffs state that they resolved this dispute by agreeing to pay a fine. Defendant does not contradict plaintiff's evidence, but states that the Department has no records of the 1986 and 1987 citations.

In April 1988, the Department quarantined lamb tongues which it found within the plaintiffs' establishment, on the ground that the tongues had not been properly soaked and salted. Plaintiffs challenged the Department's decision, stating that the tongues were properly soaked and salted as certified by their supervising rabbi. The Department countered in a letter to the plaintiffs stating that, in any case, the tongues had not been properly deveined. Plaintiffs state that this charge is still pending, while defendant says that it considers the case closed and, if any charges are still pending, it will have them dismissed.

### Plaintiffs' Claims

Plaintiffs claim that the Challenged Laws define food that is "kosher" as food that is "prepared in accordance with orthodox Hebrew religious requirements" and in so doing they violate the Establishment Clause of the First Amendment of the United States Constitution. Plaintiffs also claim that equating "kosher" with "orthodox Hebrew religious requirements" deprives Jewish consumers who do not follow Orthodox Judaism of their First Amendment right to the free exercise of religion and of their Fourteenth Amendment right to the equal protection of the laws. Plaintiffs further claim that the Challenged Laws are unconstitutionally vague in violation of due process because they fail to define "orthodox Hebrew religious requirements." Arguing that the Challenged Laws fail to provide for proper training of state inspectors with respect to koshering, therefore leading to "irregular, arbitrary and capricious ... inspection of kosher facilities by the Kosher Law Enforcement Division," plaintiffs' claim that, as applied, the Challenged Laws violate their due process rights. Finally, plaintiffs seek to enjoin the Department from disseminating information concerning future violations of the Kosher Laws to the public under Section 201-j of the Kosher Laws, until after the alleged offender is found to be guilty, because, given the alleged arbitrary and uninformed manner in which the Challenged Laws are enforced, to do otherwise would violate the plaintiffs' due process rights and irreparably damage them.

In addition to the above-described facts as to the prosecution of plaintiffs under the Challenged Laws, the parties have submitted voluminous factual material on a variety of subjects, including the way in which the Department enforces the statute; the meaning of the word kosher and the degree of agreement by consumers of kosher food products as to its meaning; and the activities of the statutorily-created Kosher Law Advisory Board. As will be seen, there are no genuine issues of material fact which prevent the court from resolving plaintiffs' facial challenge: Since the New York state courts have authoritatively interpreted the Challenged Laws, the Department cannot avoid an Establishment Clause challenge by claiming that it currently enforces the statute otherwise; on

the Department's and the intervenors' own views on the issue of the meaning of the word kosher and its understanding among consumers, a violation of the Establishment Clause is present; and plaintiffs have established their right to relief, without considering their claims of improprieties by the Kosher Law Advisory Board.

## Procedural History

Plaintiffs filed their complaint on January 16, 1996, and their amended complaint on April 15, 1996. On December 9, 1996, Magistrate Judge E. Thomas Boyle granted the intervenors' motion for permissive intervention pursuant to Fed.R.Civ.P. 24(b)(2), provided that the Hon. Sheldon Silver, Speaker of the State Assembly, be limited to intervention in his individual capacity. 170 F.R.D. 93. Plaintiff's application for a preliminary injunction was denied on the record on June 18, 1998, but agreement was reached on the record that plaintiff would be notified by defendant of any alleged violations of law prior to the release of that information for publication.

By my order of December 15, 1997, defendant's motion for abstention under the doctrine of *Railroad Commission of Texas v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), was denied. 986 F.Supp. 153. In that ruling, the history of the interpretation of the word "kosher" in New York's Kosher Laws was described as follows:

The statutory provisions at issue in this case have been interpreted for decades as equating "kosher" with "prepared in accordance with orthodox Hebrew religious requirements." As early as 1918, in *People v. Atlas*, 183 A.D. 595, 170 N.Y.S. 834 (1st Dept.1918), *aff'd without opinion*, 230 N.Y. 629, 130 N.E. 921 (1921), the New York Appellate Division, interpreting provisions of a predecessor statute that are substantially similar to those now challenged by plaintiffs, concluded that the Kosher Laws define "kosher" as "prepared in accordance with orthodox. Hebrew religious require-

ments...." *Id.* at 183 A.D. 595, 170 N.Y.S. 834.

Later cases, interpreting successor statutes containing the same basic provisions as those interpreted in *Atlas*, have likewise treated the Kosher Laws as defining "kosher" to be "prepared in accordance with orthodox Hebrew religious requirements." *See, e.g., People v. Gordon*, 258 A.D. 421, 16 N.Y.S.2d 833, (2d Dept.1940), *aff'd without opinion*, 283 N.Y. 705, 28 N.E.2d 717 (1940); *State v. Glassman*, 109 Misc.2d 1088, 441 N.Y.S.2d 346 (N.Y.Co.Ct.1981) ("The issue in this case is whether the defendants 'with intent to defraud' represented that their frank furters and salami were Kosher when in fact [they were not because they were] not prepared in accordance with the Orthodox Hebrew religious requirements."); *People v. Johnson Kosher Meat Products, Inc.*, 42 Misc.2d 534, 248 N.Y.S.2d 429, 429 (N.Y.City Civ.Ct.1964) ("Upon failure at the trial to adduce any evidence that the meat sold as kosher was not prepared wholly in accordance with Hebrew orthodox religious requirements, the charges of fraudulent misrepresentation under Section 201–a were dismissed.") This settled interpretation of the New York Kosher Laws has also been recognized by the courts of other states. *See, e.g., Erlich v. Municipal Court of the Beverly Hills Judicial District*, 55 Cal.2d 553, 557–58, 11 Cal.Rptr. 758, 360 P.2d 334 (Cal.1961) (addressing California statute with "substantially the language of the New York [Kosher Laws]," and giving that statute "the same construction as that given to the New York statutes by the courts of New York," namely, that "kosher" means " 'having been prepared under ... the orthodox Hebrew religious requirements' "). And, in an amicus brief submitted to the Supreme Court of New Jersey in *Ran-Dav's County Kosher, Inc. v. State*, 129 N.J. 141, 608 A.2d 1353 (1992), *cert. denied*, 507 U.S. 952, 113 S.Ct. 1366, 122 L.Ed.2d 744 (1993), a recent case hold-

ing the New Jersey Kosher regulations unconstitutional on grounds similar to those pressed here, the former Attorney General of the State of New York stated that the New York Kosher Laws "define kosher in terms of orthodox Jewish requirements." Brief of Amicus Curiae Robert Abrams, Attorney General of the State of New York at 16, Exh. F. to Memorandum of Defendant–Intervenors.

The opinion went on to note that:

> Defendant now disavows this interpretation of the Kosher Laws and urges that the statute "does not impose a definition of the ter[m] 'kosher'" and thus avoids plaintiffs' constitutional challenges. Ignoring the body of law interpreting the statutory provisions of which plaintiffs complain, defendant argues that, rather than defining "kosher," those provisions merely require that merchants representing their products as either "kosher" or "in accordance with orthodox Hebrew religious requirements" provide sufficient information to allow a consumer to determine for himself or herself whether the entity or individual supervising the preparation of the products in question applies standards that are consistent with the consumer's individual religious beliefs.

*Id.* at 156–157.

In the following language, I rejected defendant's argument that the Kosher Laws are essentially registration statutes, requiring only the provision of background information to consumers and imposing no definition of what is and is not kosher:

> The fundamental flaw in defendant's argument is that the statutory provisions on which he relies are additional to, and do not replace, the provisions here challenged, which have been interpreted by the state courts as equating "kosher" with "prepared in accordance with orthodox Hebrew religious requirements." *See* N.Y. Agric. & Mkts. §§ 201–a, 201–b, 201–c. Simply put, it is not reasonable to conclude that there is any

likelihood that the state courts will treat these additional legislative requirements as fundamentally transforming the Kosher Laws into mere registration statutes. This is so, even if it is presumed that the state courts would if possible construe the Kosher Laws to avoid the constitutional question presented. *See Baggett v. Bullitt,* 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964).

*Id.* at 157.

## ESTABLISHMENT CLAUSE

The Establishment Clause of the First Amendment to the United States Constitution, which applies to state governments through the Fourteenth Amendment, *Everson v. Board of Ed. of Ewing Tp.,* 330 U.S. 1, 8, 67 S.Ct. 504, 91 L.Ed. 711 (1947), provides that "Congress shall make no law respecting an establishment of religion . . . ."

On a facial challenge to a statute, the challenger must establish that no set of circumstances exists under which the statute would be constitutional. *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); *Deshawn E. v. Safir,* 156 F.3d 340, 347 (2d Cir.1998). "Statutes are presumed constitutional," *Bush v. Vera,* 517 U.S. 952, 992, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996), and "should be construed to avoid constitutional questions, but this interpretative canon is not a license for the judiciary to rewrite language enacted by the legislature." *Salinas v. United States,* 522 U.S. 52, 59–60, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997).

■ Nonetheless, as on the abstention motion, "defendant asks this court to ignore the established interpretation of the statute by the state courts for the very reason that it raises constitutional questions." 986 F.Supp. at 157. This the court cannot do. As stated in *Terminiello v. City of Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949), "[the state court's] construction of the [statute] is a ruling on a question of state law that is as

binding on us as though the precise words had been written into the [statute]." Thus, kosher under the Challenged Laws means prepared "in accordance with orthodox Hebrew religious requirements."

Defendant claims that, despite the authoritative construction of the statutes by the New York courts, the Department of Agriculture and Markets no longer interprets the word "kosher" to mean "in accordance with orthodox Hebrew religious requirements." Rather, defendant argues that the Challenged Laws speak in the disjunctive, in that they refer to products represented as "kosher" *or* as prepared "in accordance with orthodox Hebrew religious requirements." Defendant "recognizes that there is not a uniform consensus regarding what constitutes Kosher, and it is for this reason, among others, that defendant does not enforce the Law according to any particular religious standard." [3] *See* Defendant's Response to Plaintiff's Statement Pursuant to Local Rule 56.1 ¶ 9.

Whatever his purpose, defendant cannot now, when confronted with claims that the Challenged Laws violate the Establishment Clause, renounce authoritative judicial interpretations of these laws and claim that a federal court should defer to the Department's claimed new interpretation.[4]

Moreover, defendant does not deny that the Challenged Laws require the State to enforce some level of religious standards. While arguing that "the Department does not impose religiously-based substantive standards on merchants" (Def. Reply Mem. at 7), defendant acknowledges that

"[w]ithout *some* reference to religious doctrine, the State could never be able to assess whether such disclosures were being made in good faith," and that "[i]f . . . the State may permissibly enact laws to prevent kosher fraud, the State must be allowed to refer to substantive Jewish law in implementing such measures." (Def. Reply Mem. at 13.) (emphasis in original).

In *Hygrade Provision Co. v. Sherman,* 266 U.S. 497, 45 S.Ct. 141, 69 L.Ed. 402 (1925), the Supreme Court rejected a void for vagueness challenge to the New York kosher laws on the ground that they required that vendors represent as kosher only what they believe in good faith to be kosher noting that "the evidence, while conflicting, warrants the conclusion that the term 'kosher' has a meaning well enough defined to enable one engaged in the trade to correctly apply it, at least as a general thing." *Hygrade,* 266 U.S. at 501–502, 45 S.Ct. 141. The kosher laws in *Hygrade* were not challenged under the Establishment Clause.

■ I turn then to whether the Challenged Laws, as authoritatively construed by the New York courts, violate the Establishment Clause. The three-pronged *Lemon* test remains the starting point in facial challenges under the Establishment Clause, as the Supreme Court recently reiterated in *Santa Fe Independent School District v. Doe,* 530 U.S. ——, 120 S.Ct. 2266, 2281–82, 147 L.Ed.2d 295 (2000). *Lemon* requires a challenged law (1) to have a secular purpose, (2) to have a pri-

---

**3.** Given my conclusion that this claim is legally insufficient, I do not address the evidence offered by plaintiff disputing defendant's contentions as to his enforcement.

**4.** Defendant's reliance on the doctrine of federal judicial deference to a federal agency's interpretation of federal law is also unavailing. The issue is not whether there has been a legislative delegation of authority to the New York State Department of Agriculture and Markets to interpret the Challenged Laws. Cf. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., et al.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)

("If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. . . . In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency"). Here, the state courts have explicitly and continuously construed the word "kosher" in the Challenged Laws to mean products "prepared in accordance with orthodox Hebrew religious requirements."

mary effect that neither advances nor inhibits religion, and (3) not to foster excessive state entanglement with religion. *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745. Under the first prong of the *Lemon* test, state action is invalid only if the statute or activity was "motivated wholly by religious considerations." *Lynch v. Donnelly,* 465 U.S. 668, 680, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). The Challenged Laws were enacted at least in part to protect consumers of kosher products from fraud. *See Commack,* 986 F.Supp. at 154 (citing *Hygrade,* 266 U.S. at 501, 45 S.Ct. 141) ("The purpose of the statute manifestly, is to prevent and punish fraud . . . .") (quoting *People v. Atlas,* 183 A.D. 595, 596–97, 170 N.Y.S. 834 (1st Dept.1918), *aff'd without opinion,* 230 N.Y. 629, 130 N.E. 921 (1921)). Thus, the first prong of *Lemon* is satisfied.

In two recent cases in which the issues presented here were comprehensively addressed, the kosher fraud laws of the State of New Jersey and of Baltimore, Maryland were invalidated under the Establishment Clause as violating both the effect and excessive entanglement prongs of *Lemon. Ran–Dav's County Kosher Inc. v. State,* 129 N.J. 141, 608 A.2d 1353 (1992), *cert. denied,* 507 U.S. 952, 113 S.Ct. 1366, 122 L.Ed.2d 744 (1993); *Barghout v. Bureau of Kosher Meat and Food Control,* 66 F.3d 1337 (4th Cir.1995). *But see National Foods, Inc. v. Rubin,* 727 F.Supp. 104, 109 (S.D.N.Y.1989), where the court, noting that plaintiff was "not challenging the constitutional validity of New York's kosher labeling laws," rejected an Establishment Clause challenge to the laws, as applied to plaintiff, on the ground that no "theological dispute" was claimed.

The New Jersey kosher fraud regulations at issue in *Ran–Dav's* provided that it was "an unlawful consumer practice" to sell or attempt to sell food "which is falsely represented to be Kosher," with kosher defined as "prepared and maintained in strict compliance with the laws and customs of the Orthodox Jewish religion."

*Ran–Dav's,* 129 N.J. at 149, 608 A.2d 1353. The New Jersey Supreme Court held the regulations unconstitutional under the Establishment Clause as creating an excessive entanglement between religion and the State and having the effect of advancing religion. Regarding the use of the word "kosher" in the regulations, the court concluded that "there is considerable disagreement over what precepts or tenets truly represent the laws of *kashrut* [kosher]," and that "there are differences of opinion concerning the application and interpretation of the laws of *kashrut* both within Orthodox Judaism and between Orthodox Judaism and other branches of Judaism." *Id.* at 147, 608 A.2d 1353. The court found, however, that even if no such disagreement were present, the kosher fraud regulations still created excessive entanglement by involving the State in the enforcement of religious law not described in secular terms in the regulations. The court recognized that, although "civil courts may resolve controversies involving religious groups if resolution can be achieved by reference to neutral principles of law, . . . they may not resolve such controversies if resolution requires interpretation of religious doctrine," *id.,* and that "the State's adoption and enforcement of the substantive standards of the laws of *kashrut* is precisely what makes the regulations religious, and is fatal to its scheme." *Id.* at 155, 608 A.2d 1353. Finally, the court concluded that, although "the regulations may have been designed to assure truth in marketing . . . the truths being marketed are, in essence, religious truths." *Id.* at 167, 608 A.2d 1353.

In *Barghout,* the Court of Appeals for the Fourth Circuit struck down a Baltimore municipal ordinance making it a misdemeanor to, with intent to defraud, offer for sale any products labeled kosher, or indicating compliance "with the orthodox Hebrew religious rules and requirements and/or dietary laws," when the products did not in fact comply with those laws. The ordinance further stated that:

In order to comply with the provisions of this section persons dealing with either kosher meat, meat preparations, food and/or food products only, or persons dealing with both kosher and non-kosher meat, meat preparations, food and/or food products must adhere to and abide by the orthodox Hebrew religious rules and regulations and the dietary laws; otherwise he shall be in violation of this section.

*Id.* The Fourth Circuit struck the ordinance as violative of the Establishment Clause, saying, "we think it clear that [the ordinance] is on its face unconstitutional in that it fosters excessive entanglement of religious and secular authority by vesting significant investigative, interpretive, and enforcement power in a group of individuals based on their membership in a specific religious sect," *Id.* at 1342, and that its primary effect was the "advancement and endorsement of the Jewish faith, and in particular the Orthodox Jewish faith." [5] 66 F.3d at 1346.

■ The New York laws challenged here provide that any person who, with intent to defraud, falsely represents food or food products as kosher, which, as discussed above, means "prepared in accordance with Orthodox Hebrew religious requirements," may be cited for criminal penalties. The Challenged Laws further provide for the Commissioner of the Department of Agriculture and Markets to appoint a nine-person "advisory board on kosher law enforcement" (referred to here as the Kosher Law Advisory Board). As will be seen, these laws, like those addressed by New Jersey Supreme Court and the Court of Appeals for the Fourth Circuit, violate both the excessive entanglement and effects prongs of *Lemon.*

The prohibition on excessive entanglements derives from an interpretation of the First Amendment as resting "upon the premise that both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere." *People of Illinois ex rel. McCollum v. Board of Ed.,* 333 U.S. 203, 212, 68 S.Ct. 461, 92 L.Ed. 649 (1948). As the Supreme Court has elaborated, "some limited and incidental entanglement between church and state authority is inevitable in a complex modern society, . . . but the concept of a 'wall' of separation is a useful signpost." *Larkin v. Grendel's Den, Inc.,* 459 U.S. 116, 123, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982). "The core rationale underlying the Establishment Clause is preventing 'a fusion of governmental and religious functions.'" *Id.* at 126, 103 S.Ct. 505. Indeed, "the Framers did not set up a system of government in which important, discretionary governmental be would be delegated to or shared with religious institutions." *Id.* at 127, 103 S.Ct. 505. Thus, "a state may not delegate its civic authority to a group chosen according to a religious criterion." *Board of Ed. of Kiryas Joel Village School District v. Grumet,* 512 U.S. 687, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994).

"In the absence of precisely stated constitutional prohibitions, we must draw lines with reference to the three main evils against which the Establishment Clause was intended to afford protection: 'sponsorship, financial support, and active involvement of the sovereign in religious activity.'" *Lemon,* 403 U.S. at 612, 91 S.Ct. 2105 (quoting *Walz v. Tax Commission,* 397 U.S. 664, 668, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)). The Challenged Laws violate all three prohibitions in that they require the sponsorship, financial support and active involvement of New York State in the daily monitoring of the compliance of vendors of kosher products with a set of religious dietary laws, which

5. In a concurring opinion, Judge Wilkins agreed with Judge Lay, who wrote the opinion for the Court, that the entanglement and effect prongs of *Lemon* were violated and also agreed, with Judge Luttig in *his* concurring opinion, that the ordinance violated *Larson v. Valente,* 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), because it constituted an improper denominational preference.

are incorporated by reference into the Challenged Laws. As defendant acknowledges, they necessarily require state officials to refer to and rely upon religious doctrines.

Defendant and the intervenors claim, however, that, under the Challenged Laws, the State enforces only "basic" rules of kosher food preparation, agreed upon by all consumers and vendors of kosher products, which do not involve the interpretation of any religious doctrine and therefore do not require the State to resort to religious authority. This argument is belied by the language of the Challenged Laws and their interpretation by the state courts. In the Challenged Laws, "kosher" means only prepared "in accordance with orthodox Hebrew religious requirements." Even where the Challenged Laws describe some specific procedures that must be followed before a product may properly be called kosher, the procedures refer back to orthodox Hebrew religious requirements; for example, meat "shall be washed in accordance with orthodox Hebrew religious requirements ... by a duly ordained orthodox rabbi or by a person authorized by him." N.Y. Agric. & Mkts. § 201–f.

The intervenors' argument that the Challenged Laws merely require vendors to conform their products to general consumer expectations does not eliminate the problem of excessive entanglement. The consumer expectations to which the intervenors are referring are expectations of the vendors' compliance with certain interpretations of religious law, outside of the language of the statutes. Even if the intervenors' argument that there is a consensus amongst Jews on the majority of issues as to what constitutes kosher were established,[6] that would not change the fact that, as stated in *Ran–Dav's*, "the laws of *kashrut* are intrinsically religious,

whether they are ambiguous or not and whether they are disputed or not. Religious doctrines cannot be recast as secular principles simply because they are clear. Nor do religious doctrines become neutral simply because they are widely or even universally held." *Id.* at 161, 608 A.2d 1353 (citations omitted). As the New Jersey Supreme Court said of the regulations at issue in *Ran–Dav's*, 129 N.J. at 155, 608 A.2d 1353, "the State itself takes on the traditional religious supervisory role, thereby partially supplanting the Jewish organizations and institutions that historically have stood as final judges of religious matters."

The intervenors' attempts to analogize the Challenged Laws to prohibitions on selling a product marked "approved by the Vatican," if the product has not been so approved, or against advertising that a crucifix is made out of fourteen carat gold if it is not, are not persuasive; in fact, the purported analogies highlight the flaws in the Challenged Laws. The intervenors' examples would require the State simply to enforce a prohibition against vendors from engaging in garden-variety secular fraud: in the first instance, from claiming that a particular authority has endorsed their product if it has not, and in the second instance, from claiming that a product is made of a certain material if it is not. Unlike here, there would be no need for the State to rely on any religious doctrine to determine compliance with State law. Indeed, the intervenors' examples of permissible regulation more closely resemble the unchallenged disclosure statutes referred to in footnote 2.

Nor does the availability of an implied "good faith" defense to an alleged violation, arising out of the Challenged Laws' requirement of an intent to defraud, *see*

6. Defendant acknowledges the existence of some differences among various groups as to the meaning of kosher. The intervenors do as well, but they argue that any differences are peripheral and resolvable under the "good faith" defense. *See infra*, at pp. 455–56.

Plaintiffs for their part have established that defendant did not accept as a defense a statement that their meat was prepared to the satisfaction of "a rabbi of the Jewish faith" who provided kosher supervision to them.

*Hygrade,* 266 U.S. at 501–02, 45 S.Ct. 141, save them from an Establishment Clause challenge. The intervenors and defendant claim that, if a vendor asserted that it believed in good faith that its products were kosher, even if they were not, the vendor would not be prosecuted. An identical argument was rejected in *Barghout* in the following language: "Whether prosecution under the ordinance focuses on the subjective intent of the vendor, or on the vendor's compliance with the Orthodox standards of kashrut, the ordinance still fosters excess entanglement between city officials and leaders of the Orthodox faith with each and every prosecution." 66 F.3d at 1344. The same is true here, where daily enforcement of the Challenged Laws requires state officials to determine the content of religious law. Moreover, under the Challenged Laws, a vendor who believes in good faith that its products are kosher under a standard other than the orthodox standard cannot avail itself of a good faith defense because, given the statutory meaning of kosher, as authoritatively established by the New York courts, that defense requires vendors to claim that they had a good faith belief that their products were kosher in accordance with orthodox Hebrew religious requirements.

The Challenged Laws thus are unlike the generally applicable mail fraud statute involved in *Ballard v. United States,* 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946), where criminal defendants were charged with using the mails to fraudulently promote a religious movement, and the Court upheld the withholding from the jury of any issue as to the truth or falsity of their religious beliefs but asked the jury to determine whether the defendants honestly and in good faith believed what they claimed to believe. Also instructive in this regard is *Jackson v. Mann,* 196 F.3d 316 (2d Cir.1999), where the Court of Appeals for the Second Circuit reversed a grant of summary judgment to defendant prison officials, who had denied an inmate a kosher diet in reliance on the prison chaplain's conclusion that the inmate did not

meet the chaplain's definition of a Jew as "one who was born Jewish or has formally converted." Rejecting an Establishment Clause claim on the ground that the issue was "more properly anchored in the Free Exercise Clause," the Court held that "whether Jackson's beliefs are entitled to Free Exercise protection turns on whether they are 'sincerely held,' not on the 'ecclesiastical question' whether he is in fact a Jew under Judaic law." 196 F.3d at 321.

The Challenged Laws do not create excessive entanglement simply because they use a word of religious significance. *See Jones v. Butz,* 374 F.Supp. 1284, 1292–93 (S.D.N.Y.1974), *aff'd,* 419 U.S. 806, 95 S.Ct. 22, 42 L.Ed.2d 36 (1974). *Jones* involved a challenge by animal rights activists who were concerned that exempting slaughter "in accordance with the ritual requirements of the Jewish faith or any other religious faith" from the Humane Slaughter Act, 7 U.S.C. §§ 1901 *et seq.* (1970), would lead to animal rights violations, and was a violation of the Establishment Clause. The district court held that the Act permissibly accommodated the free exercise of religion and did not involve excessive entanglement. In contrast, the Challenged Laws foster excessive entanglement and advance religion because they require the State to affirmatively assume ongoing obligations of enforcement of purely religious laws, inevitably requiring the State to rely on religious authority and interpretation to properly enforce them. Thus, *Jones* offers no basis for upholding the laws challenged here. *See Ran–Dav's,* 129 N.J. at 165, 608 A.2d 1353; *Barghout,* 66 F.3d at 1343 (both distinguishing the kosher fraud law enforcement system from the constitutional religious exemption present in *Jones* ).

Cases upholding the constitutionality of statutes such as Sunday closing laws are similarly inapposite. First, "the governmental functions involved [in those cases] have no connection with any religious practices." *Jones,* 374 F.Supp. at 1293.

We are not here confronted with legislation that is religious only in its historical origins but non-religious in its current applications. *E.g., McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) (stating that Sunday closing laws, although religious in origin, are applied without reference to religious purpose or principles); (other citations omitted). The kosher regulations rely expressly on religious tenets concerning what is kosher and who should be trusted to supervise kosher food preparation.

*Ran–Dav's,* 129 N.J. at 163–4, 608 A.2d 1353; *Lemon,* 403 U.S. at 619, 91 S.Ct. 2105; *see also Lynch,* 465 U.S. at 683, 104 S.Ct. 1355 (in upholding the constitutionality of a city's creche display, the Court noted that "there is nothing here, of course, like the 'comprehensive, discriminating and continuing state surveillance' or the 'enduring entanglement' present in *Lemon.*")

Not only do the entanglements between the State and religion engendered by the Challenged Laws, in themselves, violate the First Amendment, but they also, by their nature, reflect an impermissible state advancement of religion. As stated in *Ran–Dav's:* "The Kosher regulations rely expressly on religious tenets concerning what is kosher and who should be trusted to supervise kosher food preparation. Because they work both as a constraint and as an inducement on merchants who must abide by them, and consumers who cannot avoid them, the primary, if not exclusive, effect of the regulatory process necessarily is to advance particular religious tenets." 129 N.J. at 164, 608 A.2d 1353. In *Larkin v. Grendel's Den, Inc., supra,* the Supreme Court struck down a Massachusetts zoning statute which permitted a church to veto the issuance of a liquor license to any establishment located within a 500–foot radius of the church. The Supreme Court found that the law in *Larkin* failed the *Lemon* test and violated the Establishment Clause because it both fostered ex-

cessive entanglement of government with religion and had the effect of advancing religion. "Under our system the choice has been made that government is to be entirely excluded from the area of religious instruction and churches excluded from the affairs of government;" and "the mere appearance of a joint exercise of legislative authority by Church and State provides significant benefit to religion in the minds of some by reason of the power conferred." *Larkin,* 459 U.S. at 125–126, 103 S.Ct. 505.

In *Board of Ed. of Kiryas Joel Village School District v. Grumet,* 512 U.S. 687, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994), the Supreme Court extended *Larkin* in holding that a state legislature not only may not expressly delegate governmental duties to a religious institution, but also may not otherwise "identif[y] ... recipients of governmental authority by reference to doctrinal adherence." *Grumet,* 512 U.S. at 699, 114 S.Ct. 2481. In *Grumet,* it struck down a New York statute which had created an independent school district known as the Village of Kiryas Joel, populated entirely by members of the Satmar Hasidic sect of Judaism. The Court found that, while the statute did not expressly delegate governmental authority based on religious criteria, it effectively did so, and thus was unconstitutional. *Id.* at 698–699, 114 S.Ct. 2481. The Court held that "because both the district's public-school population and its school board would be exclusively Hasidic, the statute created a 'symbolic union of church and State' that was 'likely to be perceived by the Satmarer Hasidim as an endorsement of their religious choices, or by nonadherents as a disapproval' of their own. As a result, ... the statute's primary effect was an impermissible advancement of religious belief." *Id.* at 695, 114 S.Ct. 2481 (citations omitted).

Relying particularly on *Agostini v. Felton,* 521 U.S. 203, 222–23, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), the intervenors argue that changes in Establishment

Clause jurisprudence since the decisions in *Ran–Dav's*, in 1993, and *Barghout*, in 1995, compel a result different from the result in those cases. In *Agostini*, the Supreme Court held constitutional a federally-funded program that sent public school teachers into parochial schools to provide secular remedial education to disadvantaged children. In doing so, the Court refined the "effect" prong of the *Lemon* test, as it applies to public aid to religious schools, and recognized that not all entanglements have the impermissible effect of advancing or inhibiting religion. *Agostini*, 521 U.S. at 232–33, 117 S.Ct. 1997. *See also Mitchell v. Helms*, 530 U.S.——, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000), plurality opinion at 2540–41 and concurring opinion at 2560. It noted that it had "abandoned the presumption erected in *Meek* [*v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975) ] and [*School District of the City of Grand Rapids v.*] *Ball*, [473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985) ] that the placement of public employees on parochial school grounds inevitably results in the impermissible effect of state-sponsored indoctrination or constitutes a symbolic union between government and religion." *Agostini*, 521 U.S. at 223, 117 S.Ct. 1997.

In contrast to *Agostini*, state officials in this case are charged with enforcing a set of religious laws. In *Doe v. Beaumont Independent School District*, 173 F.3d 274, 287–88 (5th Cir.1999), the court found that neutrality in neither favoring nor disfavoring religion was the key factor supporting the constitutionality of the program in *Agostini*, and it held that volunteer counseling by clergy in public schools violated the Establishment Clause. The Fifth Circuit, in distinguishing *Doe* from *Agostini*, noted that "when the government administers programs and distributes benefits according to neutral criteria which only incidentally benefit religious organizations, there is little danger that people will perceive any official endorsement of those or-

ganizations' beliefs. By contrast, there is a much greater danger that when religious organizations and representatives participate in the affairs of government—at least when they do so not as an indistinguishable part of a larger effort, but rather in a manner clearly distinct and identifiable—such participation will create the clear impression that the government has reached out to such religious organizations and representatives precisely because of their religious affiliations." *Id.* at 288 n. 59.

The same analysis applies here, where New York State has enacted laws specifically mandating° what products may be called "kosher" and has incorporated "orthodox Hebrew religious requirements" into State law. In addition, the State has created the Kosher Law Advisory Board to "advise, counsel and confer" with the Commissioner of the Department of Agriculture and Markets "on matters of policy in connection with the administration and enforcement" of the laws relating to kosher food; to, "on its own initiative ... recommend" changes to the laws to the Commissioner; and with the consent of the Commissioner, to submit for enactment by the legislature, drafts of legislation "imposing further restrictions" on the sale of kosher food products. N.Y. Agric. & Mkts. § 26–a(4).

The intervenors and defendant emphasize that New York's Challenged Laws do not place enforcement directly in the hands of religious authorities, nor require any government officials to have religious qualifications. But the Supreme Court has recently reminded us that "context" is important in evaluating a facial challenge under the Establishment Clause. *Santa Fe*, 530 U.S. at ——, 120 S.Ct. at 2282. It is incontrovertible, given the context, that in order to consistently enforce the religious code adopted by the Challenged Laws, New York State is forced to rely on advisors chosen specifically because of their religious knowledge.[7] *See Ran–Dav's*, 129 N.J. at 156, 608 A.2d 1353. As stated in

---

7. The defendant Director of the Kosher Law Enforcement Division is a rabbi, and as of the

filing of defendant's brief, New York's Kosher Law Advisory Board consisted of six rabbis,

*Barghout*, "[s]imply put, even if membership in the Bureau were not restricted to adherents of Orthodox Judaism or even if there were no Bureau at all, [the ordinance's] adoption of the Orthodox rules inevitably requires the intimate involvement of members of that faith, and the leaders of that faith, in discerning the applicable standard." *Barghout,* 66 F.3d at 1343–1344. And, "although the [State] has not expressly endorsed Orthodox Judaism or encouraged its practice by passing the ordinance, the incorporation of the Orthodox standard creates an impermissible symbolic union of church and state." *Id.* at 1345.

For the reasons stated above, and even taking *Agostini* beyond its school aid context, the entanglements involved here between religion and the State are not only excessive, in themselves, but they have the unconstitutional effect of endorsing and advancing religion. In sum, the Challenged Laws on their face violate the Establishment Clause of the United States Constitution. In light of this conclusion, the plaintiffs' other claims, under the federal and state constitutions, need not be addressed.

### CONCLUSION

The Challenged Laws, N.Y. Agric. & Mkts. Law §§ 201–a, 201–b(1), 201–c, 201–e (2–a) and (3–c), 201–f, 201–h and 26–a, on their face violate the Establishment Clause and are therefore unconstitutional. Plaintiffs' motion for summary judgment is granted with respect to their claims regarding these Sections. Defendant's and intervenors' motions for summary judgment are denied. The Clerk of Court is directed to enter judgment declaring the Challenged Laws unconstitutional and permanently enjoining defendant from enforcing them.

**SO ORDERED.**

one government official, and two "profession-

