**COMMACK SELF–SERVICE KOSHER MEATS, INC., d/b/a Commack Kosher, Brian Yarmeisch and Jeffrey Yarmeisch, Plaintiffs–Appellees,**

v.

**Rabbi Luzer WEISS, as Director of the Kosher Law Enforcement Division of The New York State Department of Agriculture and Markets, Defendant–Appellant,**

**Hon. Sheldon Silver, Abe Alper, Jon Greenfield, Jack Lee, Rabbi Moshe Portnoy, Richard Schwartz, Agudath Harabonim of the United States and Canada, Agudath Israel of America, National Council of Young Israel, Rabbinical Alliance Of America, Rabbinical Council of America, Torah**

Umesorah National Society of Hebrew Day School and Union of Orthodox Jewish Congregations of America, Intervenors–Defendants–Appellants.

Docket Nos. 00–9116, 00–9118.

United States Court of Appeals, Second Circuit.

Argued June 28, 2001.

Decided May 21, 2002.

Robert Jay Dinerstein, Dinerstein & Lesser, P.C., Commack, NY, for Plaintiffs–Appellees.

Caitlin Halligan, First Deputy Solicitor General of the State of New York, New York, N.Y. (Eliot Spitzer, Attorney General of the State of New York, Michael Belohavek, Deputy Solicitor General of the State of New York, on the brief, and Sachin Pandya, Assistant Solicitor General of the State of New York, of counsel), for Defendant–Appellant.

Nathan Lewin, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Washington, DC (Alyza D. Lewin, Noam B. Fischman, on the brief, and Dennis Rapps, National Jewish Commission on Law and Public Affairs, New York, NY, of counsel), for Intervenors–Defendants–Appellants.

Marc D. Stern, American Jewish Congress, New York, NY, for Amici Curiae American Jewish Congress and United Synagogue of Conservative Judaism.

Before MINER, LEVAL, and POOLER, Circuit Judges.

MINER, Circuit Judge.

The word "kosher" has been part of the vernacular for some time as a synonym for correct, genuine, or legitimate. *See 8 Oxford English Dictionary* 753 (1971). Its original meaning, however, lies in the centuries-old Jewish law of *kashrut,* the Hebrew noun from which "kosher" is derived. *Kashrut* encompasses the entire body of rules relating to foods that may be consumed as well as to the preparation of such foods. The Hebrew National company, a well-known purveyor of kosher hot dogs and other kosher food products, has long marketed its goods with the slogan, "[w]e answer to a higher authority." Hebrew National, http://www.hebrewnational.com/. In New York, the principal authority to which it answers is the State's Department of Agriculture and Markets, which is charged with the enforcement of the New York statutes prohibiting intentional fraud in the sale of kosher food. Whether those statutes are violative of the First Amendment command that "[the States] shall make no law respecting an establishment of religion," is the question before us on this appeal.

Defendant-appellant Rabbi Luzer Weiss, Director of the Kosher Law Enforcement Division of the New York State Department of Agriculture and Markets ("the Department"), and intervenors-defendants-appellants [1] appeal from a summary judgment entered in the United States District Court for the Eastern District of New York (Gershon, *J.*) declaring that New York Agriculture & Markets Law sections 201–a, 201–b(1), 201–c, 201–e (2–a) and (3–c), 201–f, 201–h, and 26–a ("the challenged laws") on their face violate the Establishment Clause of the First Amendment, and enjoining the Department from enforcing those provisions. The challenged laws are some of New York's statutory provisions aimed at preventing fraud in the kosher food industry. Plaintiffs-appellees are Commack Self–Service Kosher Meats, Inc., d/b/a Commack Kosher, an entity in Commack, Long Island engaged in the meat business, and its owners, Brian and Jeffrey Yarmeisch (collectively, "the Yarmeisches"). Over the last sixteen years, the Yarmeisches have been cited for violations of New York's kosher fraud laws on at least four occasions.

In January 1996, the Yarmeisches brought this action, claiming that the challenged laws violate the Establishment Clause of the First Amendment by defining "kosher" to mean food that is "prepared in accordance with the orthodox Hebrew religious requirements." *See, e.g.,* N.Y. Agric. & Mkts. Law §§ 201–a(1), 201–b(1) (McKinney 1991). The Yarmeisches also asserted a free exercise claim in which they contended that the challenged laws deprive non-Orthodox Jewish consumers of kosher food products of their First Amendment right to the free exercise of religion. Additionally, the Yarmeisches claimed that the challenged laws are unconstitutionally vague in violation of due process, and that, by reason of their irregular and arbitrary enforcement, they violate due process as applied. Lastly, the Yarmeisches sought to enjoin the Department from disseminating information concerning future violations of the challenged laws until after an alleged offender is prosecuted and found guilty. After both

1. Intervenors-defendants-appellants are the Honorable Sheldon Silver, Abe Alper, Jon Greenfield, Jack Lee, Rabbi Moshe Portnoy, Richard Schwartz, Agudath Harabonim of the United States and Canada, Agudath Israel of America, National Council of Young Israel, The Rabbinical Alliance of America, The Rabbinical Council of America, Torah Umesorah National Society of Hebrew Day Schools, and The Union of Orthodox Jewish Congregations of America (collectively, "the intervenors").

sides moved for summary judgment, the district court granted the Yarmeisches' motion, holding that the challenged laws on their face violate the Establishment Clause. The court found that (1) the challenged laws excessively entangle the state and religion because, in order to be enforced, the laws require the Department to refer to "orthodox Hebrew religious requirements," and (2) the laws have the impermissible effect of advancing Orthodox Judaism by requiring vendors of food products labeled "kosher" to conform to Orthodox kosher standards and thereby cause consumers of such products to purchase only products that are kosher under the Orthodox definition.

For the reasons that follow, we affirm.

## BACKGROUND

### I. *The Facts*

The Yarmeisches received their first civil citation for transgressing New York's kosher fraud laws [2] following an inspection of their store by the Department on July 10, 1986. The Department's inspector, Max Goldgrab, seized for testing a package of veal spareribs that was labeled "soaked and salted." [3] The Department's analysis revealed that "selected surface tissues [of the spareribs] do not contain added salt" and thus that Commack Kosher was in violation of New York's kosher fraud laws. In a letter responding to the citation, the Yarmeisches claimed that Commack Kosher "has always soaked and salted all the meats that state that they are soaked and salted. If this does not meet with the Hebrew orthodox religious requirements we need to know what the analysis was and what the standards should be." Despite this assertion, the Yarmeisches did not formally challenge the violation and paid a civil penalty fine in the amount of $600.

The Department inspected Commack Kosher again on January 7, 1987, and found another violation of New York's kosher fraud laws. This time the Department seized "two ... packages of beef chuck side steaks," each of which was marked "soaked and salted." The Department's "laboratory analysis did not reveal a significantly greater salt content in the outside surface of the steak than in the inside." The Department asserted that "[h]ad the steak been properly soaked and

---

**2.** The New York Agriculture and Markets Law provides both criminal and civil penalties for violations of the kosher fraud law provisions. A violation constitutes a class A misdemeanor unless the food has a retail value in excess of five thousand dollars, in which case the violation is classified as a class E felony. N.Y. Agric. & Mkts. Law § 201 d (McKinney 2001). Section 16(30) confers on the Department, and thus the commissioner, the authority to investigate, inspect, and supervise the sale of meat and meat preparations at establishments that are subject to the kosher law provisions and to make rules and regulations necessary for enforcement of those provisions. *Id.* § 16(30). Section 39 sets forth generally the civil penalties that the Department may impose for violations of any section of the Agriculture and Markets Law, including the kosher fraud provisions. *Id.* § 39. The attorney general is authorized to bring a civil suit to recover any penalties assessed by the commissioner. *Id.* § 44.

**3.** A detailed explication of the provisions challenged here is contained in Part I of the next section of this opinion. For now, it is sufficient to note that the heart of New York's kosher fraud statutes is the prohibition on the sale of food products falsely represented "to be kosher ... or as having been prepared under ... the orthodox Hebrew religious requirements." N.Y. Agric. & Mkts. Law § 201–a(1). One of these requirements is that, after slaughter, meat must be "koshered," through a procedure in which the meat is soaked and salted to draw out the blood. *See, e.g., Ran-Dav's County Kosher, Inc. v. State of New Jersey,* 129 N.J. 141, 147, 608 A.2d 1353 (1992).

salted[,] ... the analysis would have indicated that the outside surface of the steak ... had a measurably higher salt content than the inner part of the meat." The Department therefore concluded that "[t]he defendant's steak was not soaked and salted according to orthodox Hebrew religious requirements and was improperly offered for sale and represented as such." Accordingly, the Department alleged violations of New York Agriculture and Markets Law section 201–a(1), which prohibits the sale of any food product represented to be "kosher" that has not been prepared "in accordance with the orthodox Hebrew religious requirements," as well as section 201–c(1), which contains a similar prohibition. N.Y. Agric. & Mkts. Law §§ 201–a(1), 201–c(1). The Yarmeisches responded to the claimed violations in a letter dated April 29, 1987, which contained the following explanation of their soaking and salting method:

> We take the side steak with the top and bottom fat left on the meat and soak it in water for one half hour, salt for one hour, and then rinse thoroughly. We then proceed to remove the fat and then face the meat (remove dark meat before packaging).
>
> This is the procedure for all meat that is labeled soaked and salted, all of which is done under the direction of Rabbi Berman who has been supervising this establishment for approximately five years.

Rabbi Berman is a rabbi who adheres to the teachings of the Conservative branch of Judaism. The Yarmeisches' letter further explained that they believed their procedures for soaking and salting were in accordance with kosher requirements and requested that the Department "explain how [any problem with their procedures] can be rectified." The Department did not directly respond to their inquiry, but instead filed a verified civil complaint against the Yarmeisches. Ultimately, the Yarmeisches paid a $300 civil penalty fine as punishment for the 1987 violation.

After a third inspection of Commack Kosher in April 1988, the Department quarantined lamb tongues on the ground that the tongues had not been properly soaked and salted. The specific allegation of wrongdoing was that the tongues were found soaking in a solution of salt water, which "is improper preparation [that] render[ed] the tongues irreversibly non "kosher" ". The Yarmeisches challenged the Department's decision, stating that the tongues were properly soaked and salted as certified by their supervising rabbi. The Department countered with a letter to the Yarmeisches claiming that, in any event, the tongues had not been properly deveined in accordance with Orthodox Hebrew requirements. The Yarmeisches state that this charge is still pending, while the Department says that it considers the case closed and, if any charges are still pending, it will have them dismissed.

The Department inspected Commack Kosher again on February 22, 1993. A month later, the Department informed the Yarmeisches that by "offering for sale poultry as kosher without the required markings on labels 'soaked and salted' or 'not soaked and salted,' " the Yarmeisches had violated New York Agriculture and Markets Law section 201–a(2). The Department's letter directed the Yarmeisches to submit payment of a civil penalty in the amount of $11,100 within fifteen days to avoid the initiation of court proceedings against them. The Yarmeisches disputed the Department's allegations and claimed that, at the time of inspection, the poultry at issue had not been offered to the public for sale. The Department eventually withdrew the assessed violation.

## II. *Procedural History*

On January 16, 1996, about three years after their last assessed violation, the Yarmeisches brought this action against the Department[4] in the United States District Court for the Eastern District of New York. They amended their complaint on April 15, 1996. The Yarmeisches claimed that by defining "kosher" to mean food that is "prepared in accordance with orthodox Hebrew religious requirements," New York's kosher fraud laws violate the Establishment Clause. The Yarmeisches also brought free exercise and equal protection claims based on the allegation that the challenged laws equate "kosher" with "orthodox Hebrew religious requirements." Additionally, the Yarmeisches claimed that the challenged laws are unconstitutionally vague in violation of due process because they fail to define "orthodox Hebrew religious requirements." Arguing that the challenged laws fail to provide for proper training of state inspectors with respect to koshering, therefore leading to "irregular, arbitrary and capricious ... inspection of kosher facilities by the Kosher Law Enforcement Division," the Yarmeisches claimed that, as applied, the challenged laws violate their due process rights. Finally, the Yarmeisches sought to enjoin the Department from disseminating information concerning future violations of the challenged laws to the public[5] until after an alleged offender is prosecuted and found guilty, because to do otherwise violates due process and causes irreparable harm.

On October 18, 1996, the Department sought by motion to have the district court abstain from resolving the Yarmeisches' claims pursuant to *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). In its motion, the Department, in a contention abandoned on appeal, claimed that the meaning of "kosher" under the challenged laws was an unresolved issue of New York law, and thus that the court should refrain from ruling on the laws' constitutionality. In an opinion and order dated December 15, 1997, the district court denied the motion because "[t]he statutory provisions at issue in this case have been interpreted for decades as equating 'kosher' with 'prepared in accordance with orthodox Hebrew religious requirements.'" *Commack Self-Service Kosher Meats v. Rubin,* 986 F.Supp. 153, 156 (E.D.N.Y.1997). The court based its finding on numerous decisions of New York courts dating as far back as 1918. *See id.* (citing *People v. Atlas,* 183 A.D. 595, 597, 170 N.Y.S. 834 (1st Dep't 1918), *aff'd,* 230 N.Y. 629, 130 N.E. 921 (mem.) (1921) (noting that "kosher" in the then-existing kosher fraud laws was used "evidently in the ordinary sense in which it is used in the trade, which is to designate meat as having been prepared under ... the orthodox Hebrew requirements"), and *State v. Glassman,* 109 Misc.2d 1088, 1090, 441 N.Y.S.2d 346, 348 (County Ct.1981) ("The issue in this case is whether the defendants 'with intent to defraud' represented that their frankfurters and salami were Kosher when in fact [they were not because they were] not

4. On December 9, 1996, Magistrate Judge E. Thomas Boyle granted the motion of the intervenors for permissive intervention pursuant to Federal Rule of Civil Procedure 24(b)(2), provided that the Hon. Sheldon Silver be limited to intervention in his individual capacity.

5. Such publication is permitted by New York Agriculture & Markets Law section 201 j, which provides that after proper notification to the violator, certain information concerning the violation "shall be available to the public."

prepared in accordance with the Orthodox Hebrew religious requirements.")).

The Yarmeisches moved for preliminary injunctive relief on June 9, 1998. On June 18, 1998, the district court denied the motion, but the parties agreed on the record that the Yarmeisches would be notified of any alleged violations of the challenged laws prior to the release of that information to the public. After the completion of discovery, on March 1, 1999, the intervenors moved for summary judgment on the first six claims in the Yarmeisches' complaint, each of which attacked the challenged laws on their face. The Department moved for summary judgment on all the claims on June 7, 1999. Also on June 7, 1999, the Yarmeisches filed a cross-motion for summary judgment on all claims.

In an opinion and order dated July 28, 2000, the district court granted the Yarmeisches' motion and declared that "N.Y. Agric. & Mkts. Law §§ 201–a, 201–b(1), 201–c, 201–e(2 a) and (3–c), 201–f, 201–h and 26–a, on their face violate the Establishment Clause and are therefore unconstitutional." *Commack Self–Service Kosher Meats, Inc. v. Rubin,* 106 F.Supp.2d 445, 459 (E.D.N.Y.2000). The court began its analysis by explaining that New York's kosher fraud laws equate "kosher" with "prepared in accordance with orthodox Hebrew religious requirements," rejecting for a second time the Department's contention that the laws are merely registration statutes that impose no definition of "kosher." *Id.* at 452. The court then turned to an evaluation of the challenged laws under the test outlined in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The court held the challenged laws unconstitutional because they create an excessive entanglement between the State and religion and impermissibly advance religion.

In the district court's view, the challenged laws create an excessive entanglement because enforcement of the laws requires reference to religious tenets not contained in the statute. *See Commack Self–Service,* 106 F.Supp.2d at 454–55, 457. The court did not find an excessive entanglement "simply because [the challenged laws] use a word of religious significance," but rather because "they require the sponsorship, financial support and active involvement of New York State in the daily monitoring of the compliance of vendors of kosher products with a set of religious dietary laws, which are incorporated by reference into the Challenged Laws." *Id.* at 454–55. Moreover, the court explained that "[e]ven where the Challenged Laws describe some specific procedures that must be followed before a product may properly be called kosher, the procedures refer back to orthodox Hebrew religious requirements; for example, meat 'shall be washed in accordance with orthodox Hebrew religious requirements ... by a duly ordained orthodox rabbi or by a person authorized by him.' N.Y. Agric. & Mkts. § 201–f." *Id.* at 455.

Additionally, the district court held that the challenged laws represent an impermissible state advancement of religion because (1) they require "state officials ... [to] enforc[e] a set of religious laws," *id.* at 458, and (2) the incorporation of Orthodox kosher standards "creates an impermissible symbolic union of church and state," *id.* at 459.(internal quotation marks omitted). The district court therefore held that the challenged laws on their face violate the Establishment Clause and, accordingly, did not address the Yarmeisches' other claims. The district court's judgment was entered on July 31, 2000, declaring the challenged laws unconstitutional and permanently enjoining the Department from enforcing them. This appeal followed.

## DISCUSSION

### I. *New York's Kosher Fraud Statutes*

In 1915, the New York legislature added to a penal statute prohibiting false labeling, a provision that was designed "to prevent and punish fraud in the sale of [kosher] meats or [kosher] meat preparation." *Atlas,* 183 A.D. at 596, 170 N.Y.S. 834. New York's kosher fraud statutes presently are contained in Article 17 of the State's Agriculture and Markets Law entitled "Adulteration, Packing, and Branding of Food and Food Products." Article 17 includes a number of provisions relating to various food items. Section 199–a(1) of Article 17 generally prohibits the sale of "any article of food which is adulterated or misbranded." This case involves a constitutional challenge to the provisions of New York's kosher fraud laws that define "kosher" as "prepared in accordance with orthodox Hebrew religious requirements," mandate adherence to those requirements, or are integral to the State's enforcement of such requirements. Those provisions are sections 201–a, 201–b(1), 201–c, 201–e(2–a) and (3–c), 201–f, 201–h, and 26–a.

Section 201–a provides that:

1. A person who, with intent to defraud, sells ... any ... article of food ... and falsely represents the same to be kosher or kosher for Passover ... or as having been prepared under ... the orthodox Hebrew religious requirements ... is guilty of a class A misdemeanor, except that ... provided said meat or meat preparations in violation has a retail value in excess of five thousand dollars, [a person] is guilty of a class E felony....

2. All fresh meats, meat by-products, meat food products and poultry offered for sale at retail as kosher shall be marked on the label when packaged or by a sign when not packaged, with the words "soaked and salted" or "not soaked and salted" as the case may be. Such words when marked on the label or by a sign shall be in letters at least as large as the letters of the words on the label or sign designating such meat, meat by-products, meat food products and poultry as kosher.

3. Fresh meat, meat by-products, meat food products and poultry shall be defined as meat or poultry that has not been processed, except for salting and soaking.

4. Every person who sells or exposes for sale, at wholesale or retail, any kosher meat ... or poultry shall retain all records with respect to the origin of such kosher meat ... or poultry....

N.Y. Agric. & Mkts. Law § 201–a.

Section 201–b(1) is identical to section 201–a(1) except that it applies to the sale of food products in hotels and restaurants. Section 201–c, entitled "Fraudulent identification of food and food products," provides that no person shall "[w]ilfully mark ... as kosher, or as kosher-style, or as having been prepared in accordance with the Hebrew orthodox religious requirements food or food products not kosher or not so prepared." *Id.* § 201–c(1). Section 201–c(2) prohibits the defacement or alteration of labels affixed to food products to indicate that they are "kosher or have been prepared in accordance with the Hebrew orthodox religious requirements." *Id.* § 201–c(2). Section 201–c(3) forbids the sale, possession, or disposal of (1) any food product without its original slaughterhouse label, or (2) any food product to which such label has been fraudulently affixed. *Id.* § 201–c(3).

Section 201–e(2 a) provides that "[i]n the event that non-prepackaged fresh meat or poultry is sold and delivered off-premises as Kosher the meat or poultry and the bill of sale, if any, rendered at the time of

delivery shall have affixed to them a label or the printed words 'not soaked and salted' or 'soaked and salted' as the case may be." *Id.* § 201–e(2–a). Section 201–e(3–c) requires slaughterhouses that sell kosher food products to maintain records "regarding the time, place, date, person or organization supervising the slaughter of [an] animal and the number of animals slaughtered in accordance with orthodox Hebrew religious requirements." *Id.* § 201–e(3 c).

Section 201–f, captioned "Kosher meat or poultry," provides that:

1. All meat or poultry which is sold ... and is represented as having been prepared in accordance with orthodox Hebrew religious requirements and which has not been soaked and salted immediately after slaughter on the premises where slaughtered:

(a) shall have affixed to it a tag or plumba stating the date and time of day ... of slaughter; and

(b) shall be washed in accordance with orthodox Hebrew religious requirements within seventy-two hours after slaughter, and within each subsequent seventy-two hour period, by a duly ordained orthodox rabbi or by a person authorized by him. . . .

2. No person shall sell, offer or expose for sale any meat or poultry which is represented as having been prepared in accordance with orthodox Hebrew religious requirements, unless such meat or poultry is in compliance with subdivision one of this section.

3. For purposes of this section:

(a) [defining "meat"]

(b) [exempting liver from 1(b)]

4. All kosher poultry in the form of the whole bird shall be tagged with a plumba identifying it as kosher. Whole birds shall be so tagged at the original slaughterhouse.

5. The commissioner shall promulgate rules and regulations as are necessary to implement the provisions of this section, including but not limited to, the type of kosher identification to be affixed to each of the parts of such meat and poultry.

*Id.* § 201–f.

Section 201–h prohibits the "label[ing of] food or food products with the words parve or pareve or in any way ... indicat[ing] that the food or food product may be used or consumed indiscriminately with meat, poultry or dairy products according to Orthodox–Hebrew requirements when such food or food products are impermissible for such use or consumption." *Id.* § 201–h.

Lastly, section 26–a establishes a nine-person advisory board on kosher law enforcement within the Department. The advisory board's members are appointed by the commissioner of the Department. The advisory board's role under the statute is

to advise, counsel and confer with the commissioner on matters of policy in connection with the administration and enforcement of [the kosher fraud] laws ..., to consider all matters submitted to it by the commissioner, and on its own initiative to recommend to the commissioner such changes in the [kosher fraud] laws ... as may be deemed advisable ... and, with the consent of the commissioner, to submit for enactment by the legislature such draft or drafts of legislation imposing such further restrictions on the possession, sale and exposure for sale of kosher meats, meat preparations and food products, as may be deemed necessary.

*Id.* § 26–a(4).

The provisions outlined here are not all of New York's kosher fraud laws, but only

those challenged by the Yarmeisches and held unconstitutional by the district court.[6]

## II. *The* Lemon *Test*

■ As the Supreme Court has recently reiterated, in "cases involving facial challenges on Establishment Clause grounds, ... we assess the constitutionality of an enactment by reference to the three factors first articulated in Lemon v. Kurtzman, 403 U.S. 602, 612, 91 S.Ct. 2135, 29 L.Ed.2d 745 (1971)." *Santa Fe Ind. Sch. Dist. v. Doe,* 530 U.S. 290, 314, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (internal quotation marks and citations omitted). The *Lemon* factors require that a challenged law (1) have a valid secular purpose; (2) have a primary effect that neither advances nor inhibits religion; and (3) not foster excessive state entanglement with religion. 403 U.S. at 612–13, 91 S.Ct. 2105. We treat the excessive entanglement prong as a part of our "inquiry into a statute's effect." *Agostini v. Felton,* 521 U.S. 203, 233, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). We find the challenged laws do not pass constitutional muster under the *Lemon* test because they have a primary effect that both advances and inhibits religion.[7]

## A. *The Entanglement Factor*

■ Here the entanglement of the State and religious authorities is extensive and contributes to a primarily religious effect. The Supreme Court has explained that the Framers understood the First Amendment's prohibition on laws "respecting an establishment of religion" to preclude government "sponsorship [of religion], financial support [for religion], [or the] active involvement of the sovereign in religious activity," *Walz v. Tax Commission,* 397 U.S. 664, 668, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). Like the Establishment Clause generally, the prohibition on excessive government entanglement with religion "rests upon the premise that both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere." *Illinois ex rel. McCollum v. Bd. of Educ.,* 333 U.S. 203, 212, 68 S.Ct. 461, 92 L.Ed. 649 (1948).

It appears to us that the challenged laws excessively entangle government and religion because they (1) take sides in a religious matter, effectively discriminating in favor of the Orthodox Hebrew view of dietary requirements; (2) require the State to take an official position on religious doctrine; and (3) create an impermissible fusion of governmental and religious functions by delegating civic authority to individuals apparently chosen according to religious criteria.

The Department argues that the challenged laws do not excessively entangle

---

**6.** For example, there are several provisions that require the identification or registration of the person or organization certifying a food product as kosher, *see, e.g.,* N.Y. Agric. & Mkts. Law §§ 201–g, 201–e(3), and 201–i, as well as several provisions requiring that food products represented as kosher be labeled as such, *see, e.g., id.* §§ 201–e(1) and (2). None of these provisions were challenged by the Yarmeisches and thus are not at issue on this appeal.

**7.** Plaintiffs contend we should judge the constitutionality of these laws under the standard of strict scrutiny, as in *Larson v. Valente,* 456 U.S. 228, 246, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), and defendants claim that, because this is a facial attack, we should apply the rule of *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), requiring the plaintiff to show that "no set of circumstances exists under which the [statute] would be valid." We need not answer either question because we conclude for the reasons given that, as to both questions, the laws fail the test of constitutionality even using the assumptions that are most accommodating to the State.

the government with religion because "no one disputes the meaning of the term 'kosher.'" There is ample evidence in the record to support the opposite conclusion. In a guide to observance of Jewish dietary law, published by the United Synagogue Commission on Jewish Education, author Samuel H. Dresner notes that

[o]ver the years and in varying locales, rabbinic authorities differed in their interpretations of specific laws [of *kashrut* ].... To cite a famous example: Sephardic Jews eat rice and legumes on Passover; Ashkenazic Jews do not. Ashkenazic Jews, by and large, do not eat the hindquarters of beef; Sephardic Jews do.

....

Some of the decisions [regarding the laws of *kashrut* ] recorded [in this book] are not accepted by all authorities on Jewish law, notably decisions about wine, cheese, gelatin, swordfish and sturgeon. This is not a novel situation in the history of Jewish law. There have always been disagreements on various points.

Samuel H. Dresner, *The Jewish Dietary Laws* 55–56 (1982).

The New Jersey Supreme Court, in striking down its state's kosher fraud laws as violative of the Establishment Clause, also rejected the State of New Jersey's claim that there is a consensus among the branches of Judaism regarding the proper standards for the preparation and sale of kosher food products: "[T]here is considerable disagreement over what precepts or tenets truly represent the laws of kashrut. There are differences of opinion concerning the application and interpretation of the laws of kashrut both within Orthodox Judaism and between Orthodox Judaism and other branches of Judaism." *Ran–Dav's County Kosher v. New Jersey*, 129 N.J. 141, 147, 608 A.2d 1353 (1992) (citing

Herman Wouk, *This Is My God* (1959), reprinted in *The Life of Torah* 98–99 (Jacob Neusner ed.1974); Rabbi Hayim Halevy Donin, *To Be a Jew* 102–04, 112–19 (1972); Rabbi J. David Bleich, *Contemporary Halakic Problems* 84–92 (1977)). For example, Orthodox Jews of the Sephardic sect adhere to "glatt" kosher standards that are more stringent than those followed by other Orthodox Jews. Raphael Poliakoff, *What Is Glatt Kosher?*, Kashrus Newsletter, vol. 1, no. 5. As between different branches of Judaism, "Conservative and Orthodox rabbis differ sharply on many ... issues" such as the kosher status of wine, cheese, sturgeon, and swordfish. Mark A. Berman, *Kosher Fraud Statutes and the Establishment Clause: Are They Kosher?*, 26 Col. J.L. & Soc. Probls. 1, 8 (1992). It is also widely recognized that "the strain between all three denominations [Orthodox, Conservative, and Reform] has increased in recent years." *Id.*

We find it indisputable that there are differences of opinion within Judaism regarding the dietary requirements of *kashrut*. As a result, because the challenged laws interpret "kosher" as synonymous with the views of one branch, those of Orthodox Judaism, the State has effectively aligned itself with one side of an internal debate within Judaism. This it may not do. As the Supreme Court has stated: "Whatever else the Establishment Clause may mean[,] ... it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed." *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 605, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). *See also Larson*, 456 U.S. at 244, 102 S.Ct. 1673 ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."); *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266,

21 L.Ed.2d 228 (1968) ("[Government] may not aid, foster, or promote one religion or religious theory against another."); *Everson v. Bd. of Educ.*, 330 U.S. 1, 15, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (noting that the Establishment Clause prohibits passage of laws that "aid one religion, aid all religions, or prefer one religion over another"). Thus, we find that the challenged laws' preference for the views of one branch of Judaism excessively entangles the State with religion in violation of the Establishment Clause.

The challenged laws also excessively entangle the State with religion because they require New York to adopt an official State position on a point of religious doctrine. The Department argues that this is not so for two reasons. First, the Department claims that the challenged laws "merely incorporate established trade standards that require the State to verify objective physical characteristics of food and whether food has been prepared or handled in certain ways." Second, the Department asserts that the "intent to defraud" requirement of the challenged laws eliminates the possibility that it will need to refer to religious authorities in enforcement proceedings. Because "the Department focuses primarily on ascertaining a vendor's basis for his or her good faith belief that the product being offered for sale is kosher," there is no "need [for the Department] to independently determine whether a product complies with kosher trade standards." We are unpersuaded by these contentions.

In order to assert that a food article does not conform to kosher requirements, New York must take an official position as to what are the kosher requirements. In doing so, the Department must either interpret religious doctrine or defer to the interpretations of religious officials in reaching its official position. The State thus impermissibly "weigh[s] the significance and the meaning of disputed religious doctrine," *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 452, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969) (Harlan, J., concurring), or "employ[s] religious organizations as an arm of the civil [government] to perform the function of interpreting and applying state standards," *id.* at 451, 89 S.Ct. 601.

To illustrate, in response to their third citation, the Yarmeisches filed a demand for a bill of particulars, requesting that the State set forth in detail certain Orthodox Hebrew religious requirements for kosher food preparation. In order to respond to this demand, State officials corresponded with various Department officials seeking information regarding the proper koshering requirements. For example, a letter sent by Earl S. Roberts, Assistant Attorney General, to Michael McCormick, Assistant Counsel for the Department, requested assistance in responding to the Yarmeisches' demand and instructed McCormick that "[t]he [b]ill [of particulars] should describe briefly each requirement of the kosherizing, i.e. deveining, soaking, salting, and rinsing and identify the code of Jewish Law (Shulhan Aruch) by the tractate and sections which set forth these requirements in full detail."

Another letter, from Aaron Levine, a kosher food inspector with the Department, to Joan A. Kehoe, Counsel for the Department, set forth the relevant sections and chapters of Yoreh Deah, a book of Jewish laws, corresponding to the Yarmeisches' requests for more information regarding the kosher violations alleged against them in the verified complaint. Additionally, there are letters from Rabbi Rubin, an Orthodox rabbi who was then Director of the Division of Kosher Law Enforcement, clarifying various points

raised by the Yarmeisches' demand. For example, one letter from ·Rabbi Rubin to Kehoe explains ·that "[i]f members of the legal community, whether in Agriculture or the Attorney General's office, want us to trace the origin of (halacha) Jewish law, they should re-phrase their question and ask where in the [16th century] codes of Jewish law is a particular law found," rather than earlier biblical or Talmudic sources.

The draft bill of particulars [8] prepared by New York State in response to the Yarmeisches' request contains the following: .

1) Veins that contain forbidden blood have to be removed [as] indicated in Section 65, chapter 1 through 5, referred to as laws for removing veins of forbidden blood (Yore Dayah) located in Shulhan Aruch.

1b) Law of soaking and salting are in Shulhan Aruch (Yore Dayah chapter 1 through 21).

. . . .

3a) One blood vein on either side of a tongue has to be removed and the tip of a tongue has to be removed.

The Yarmeisches demand for a bill of particulars merely made more obvious a fact that would have been true even without the demand for a bill of particulars. The State authorities could not make a determination that the Yarmeisches' meat did not conform to kosher requirements without first having arrived at an official position on what the kosher requirements are. To do so excessively entangles the State with religion. *See Presbyterian Church,* 393 U.S. at 451–52, 89 S.Ct. 601.

We also find that the challenged laws fail the excessive entanglement inquiry because they run afoul of "the core rationale underlying the Establishment Clause[, which] is preventing 'a fusion of governmental and religious functions.'" *Larkin,* 459 U.S. at 126, 103 S.Ct. 505 (quoting *School District of Abington Township v. Schempp,* 374 U.S. 203, 222, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963)). This prohibition is violated not only· by the requirement that the State adopt an official position on a matter of religious doctrine, but also by the existence and activities of the Advisory Board.

Section 26–a of the Agriculture and Markets Law establishes an "advisory board on kosher law enforcement" that is required by statute "to advise,·counsel and confer" with the Department commissioner on "matters of policy in connection with the administration and enforcement" of the kosher fraud laws, "and on its own initiative to recommend to the commissioner such changes in the [kosher fraud] laws or rules[,] . . . and with the consent of the commissioner, to submit for enactment by the legislature such . . . legislation . . . as may be· deemed necessary." N.Y. Agric. & Mkts. Law § 26–a(4).

The Department argues that the existence and activities of the Advisory Board do not conflict with the Establishment Clause because there is "a complete absence of any Board involvement in enforcement activities." The Board is granted extremely broad powers "to advise, counsel, and confer" with the Department commissioner on policy matters related to enforcement issues and even to draft and submit proposed legislation. We therefore do not find to be wholly accurate the Department's contention that there is a "complete absence" of Board involvement with

---

**8.** The record on appeal does not make clear whether a final bill of particulars was delivered.

enforcement of the challenged laws. Although members of the Board do not directly participate in enforcement activities such as the actual inspection of kosher food establishments, issuance of citations, or pursuit of court action against alleged violators, we decline to take such a narrow view of the Board's involvement with enforcement of the challenged laws. To conclude otherwise, would be to exalt form over substance in light of the broad powers granted to the Board that substantially affect enforcement of the challenged laws.

■ While we acknowledge that "some limited and incidental entanglement between church and state authority is inevitable in a complex modern society," *Larkin,* 459 U.S. at 123, 103 S.Ct. 505, "[w]here 'fusion' [of governmental and religious authority] is an issue, the difference lies in the distinction between a government's purposeful delegation on the basis of religion and a delegation on principles neutral to religion, to individuals whose religious identities are incidental to their receipt of civic authority." *Grumet,* 512 U.S. at 699, 114 S.Ct. 2481. In our case, the Board's purpose—to advise the Department regarding the requirements of Orthodox Jewish dietary laws—and the fact that, of the six rabbis on the Board, all are Orthodox, convince us that New York's delegation of authority to the Board was made on the basis of religion and not "on principles neutral to religion, to individuals whose religious identities are incidental to their receipt of civic authority." *Id.* at 699, 114 S.Ct. 2481.

We find it insignificant that section 26–a does not require that Board members be rabbis or even Orthodox Jews. Instead, we agree with the Fourth Circuit that

> even if membership [o]n the [Advisory Board] were not restricted to adherents of Orthodox Judaism, or even if there were no [Advisory Board] at all, [the laws'] adoption of the Orthodox rules inevitably requires the intimate involvement of members of that faith, and the leaders of that faith, in discerning the applicable standard.

*Barghout v. Bureau of Kosher Meat & Food Control,* 66 F.3d 1337, 1343–44 (4th Cir.1995). By creating a regime in which there is a combined exercise of civic and religious authority, the challenged laws violate the fundamental principle underlying the Establishment Clause, which is "to prevent, as far as possible, the intrusion of either [government or religion] into the precincts of the other." *Lemon,* 403 U.S. at 614, 91 S.Ct. 2105.

We also note that one provision of the challenged laws, section 201–f(1)(b), represents an extraordinary entanglement of government and religion. Section 201–f requires that meat represented as "having been prepared in accordance with orthodox Hebrew religious requirements," but not immediately soaked and salted after slaughtering, must be properly washed "by a duly ordained *orthodox* rabbi or by a person authorized by him." N.Y. Agric. & Mkts. Law § 201–f (emphasis added). That provision, therefore, compels a kosher food vendor to employ a rabbi of a particular branch of Judaism in certain circumstances. The Department conceded at oral argument on this appeal that this provision cannot withstand constitutional attack, but contends that we should sever this requirement from the remaining provisions, which are themselves constitutional. We decline to do so because we find this particular provision indicative of the many ways in which the challenged laws excessively entangle the State with religion.

For all these reasons, we find that the challenged laws excessively entangle the State of New York and religion, and there-

fore run afoul of the Establishment Clause.

## B. *The Advancement of Religion Factor*

■ We also find that the challenged laws fail the second prong of the *Lemon* test, which mandates that, to avoid conflict with the Establishment Clause, a principal or primary effect of a challenged law must neither advance nor inhibit religion. 403 U.S. at 612, 91 S.Ct. 2105. The challenged laws violate this prohibition because they (1) have a primary effect that both advances religion, by preferring the dietary restrictions of Orthodox Judaism over those of other branches, and inhibits religion, by effectively prohibiting other branches from using the kosher label in accordance with their religious beliefs, and (2) create an impermissible joint exercise of religious and civic authority that advances religion. We reach this conclusion for reasons similar to those that demonstrate excessive entanglement of government and religion.

First, as discussed above, the challenged laws discriminate in favor of the Orthodox view regarding the dietary requirements of *kashrut.* Through these laws, the State has selected the views of one branch of Judaism, thereby placing its imprimatur on the religious views of the one to the exclusion of others. Moreover, the use of the State's enforcement authority to prevent labeling of food products that do not meet Orthodox Hebrew religious requirements as kosher confers a substantial benefit on Orthodox Jews and not on others. We find that this constitutes an impermissible advancement of religion in violation of the Establishment Clause.

The challenged laws are significantly different in both kind and degree from those laws the Supreme Court has held merely have an "indirect, remote, or incidental benefit upon religion," *Lynch,* 465 U.S. at 683, 104 S.Ct. 1355 (internal punctuation omitted), and therefore do not advance religion. For example, in *Lynch,* the Court held that the inclusion of a creche within a Christmas holiday display comprised of many figures and decorations traditionally associated with Christmas did not confer a substantial and impermissible benefit on religion in general or on Christianity in particular because its "reason or effect merely happens to coincide or harmonize with the tenets of some ... religions." *Id.* at 682, 104 S.Ct. 1355 (quoting *McGowan v. Maryland,* 366 U.S. 420, 442, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)). The Court reached the same conclusion regarding legislative prayers in *Marsh v. Chambers,* 463 U.S. 783, 792, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), and Sunday closing laws in *McGowan,* 366 U.S. 420, 81 S.Ct. 1101. None of the governmental actions challenged in those cases, however, involved the preference by government of one interpretation of sacred text over others.

Moreover, unlike the governmental actions at issue in the above-cited cases, the kosher fraud laws also inhibit religion. This is so because, by defining "kosher" as synonymous with the views of only Orthodox Judaism, the State prohibits members of other branches of Judaism from using the kosher label in accordance with the dictates of their religious beliefs where their dietary requirements differ from those of Orthodox Judaism. As a result, kosher food vendors can only comply with the law, and thus avoid the risk of civil and criminal sanctions, when they accept a meaning of kosher as defined by religious views that are not their own. We find this to be an impermissible inhibition of religion.

Second, the fusion of governmental and religious authority discussed in relation to the excessive entanglement inquiry—State

reliance on religious authorities and the establishment and activities of the Advisory Board—creates a "joint exercise of . . . authority [that] provides a significant symbolic benefit to religion in the minds of some by reason of the power conferred." *Larkin*, 459 U.S. at 125–26, 103 S.Ct. 505. The Supreme Court has held that even the mere appearance of such joint exercise "can be seen as having a 'primary' and 'principle' effect of advancing religion." *Id.* at 126, 103 S.Ct. 505. Here, the challenged laws, as described earlier, produce an *actual* joint exercise of governmental and religious authority. United exercises of authority of this kind are prohibited by the Establishment Clause because of the danger that the government's action will be "perceived by [some] as an endorsement of their religious choices, or by [others] as a disapproval of their own." *Grumet*, 512 U.S. at 695, 114 S.Ct. 2481 (internal quotation marks omitted). Thus, by defining kosher according to the Orthodox view, the challenged laws "symbolically plac[e] the government's official seal of approval on one religious view." *Marsh*, 463 U.S. at 792, 103 S.Ct. 3330 (internal quotation marks omitted).

For these reasons, we find that New York's kosher fraud laws at issue in this case both impermissibly advance and impermissibly inhibit religion in violation of the Establishment Clause.

## C.  *The Secular Purpose Factor*

Finally, because the secular purpose prong of the *Lemon* test is often easily satisfied, and is uncontested by the parties here, we address it last. This prong rarely presents the greatest obstacle for laws attacked on Establishment Clause grounds because governmental action will only be found to lack a secular purpose where "there [is] no question that the statute or activity was motivated wholly by religious considerations." *Lynch*,

465 U.S. at 680, 104 S.Ct. 1355. The parties here do not dispute that the challenged laws were enacted for the secular purpose of protecting consumers from fraud in the kosher food market.

We agree with the New Jersey Supreme Court that a state has "a valid interest in preventing fraud in the sale of any foods, including kosher foods." *Ran–Dav's*, 129 N.J. at 167, 608 A.2d 1353. This interest in protecting against fraud in the kosher food market extends to the general public. Indeed, Jewish consumers reportedly now make up less than thirty percent of the consumers of kosher food. *See* Frank Bruni, *The Brave New World of Kosher; Foods Exert a Growing Appeal That Isn't Just for Jews*, N.Y. Times, Nov. 15, 1996, at B1. The remainder are Muslims and others with similar religious requirements, persons with special dietary restrictions, and those who simply prefer food bearing the kosher label as a symbol of purity. The State clearly has a valid secular interest in protecting from fraud all those who choose to consume kosher food products. We do note, however, that the challenged laws imperfectly accomplish this secular purpose because their avowed purpose is amply covered by the existing general fraud laws. *Cf. Larkin*, 459 U.S. at 124, 103 S.Ct. 505 ("[T]hese valid secular objectives can be readily accomplished by other means."). For example, section 199–a(1) prohibits any misbranding of food, and therefore would penalize vendors who falsely represented their products to be kosher according to the standard described on the label. In other words, under the general statutory scheme governing fraud in the food industry, the State "can prevent fraud in the sale of kosher food in a less restrictive and neutral manner by simply requiring that any vendor engaged in the sale of kosher food state the basis on which the food is labeled kosher." *Barghout*, 66 F.3d at 1346 n. 15. Thus, the valid secular purpose articulated

by the State can be accomplished by nondiscriminatory means that do not advance religion.

In sum, we find the New York kosher fraud laws challenged here unconstitutional on their face. Even assuming the challenged laws were enacted for a valid secular purpose, they violate the Establishment Clause by fostering excessive State entanglement with religion and by producing a primary effect that both advances and inhibits religion. Because we find the challenged laws unconstitutional on their face, we need not address the Yarmeisches' remaining arguments.

## CONCLUSION

In accordance with the foregoing, the judgment of the district court is affirmed.